Granville Cosby LEE, Plaintiff,

v.

R.M. WILLIAMS, et al., Defendants.

No. CIV. A. 2:00CV660.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 9, 2001.

Reid H. Ervin, Norfolk, VA, for Plaintiff.

Jeff Wayne Rosen, Pender & Coward, Va. Beach, VA, for Defendants.

### OPINION & ORDER

DOUMAR, District Judge.

This matter is before the Court on Plaintiff Granville Cosby Lee's ("Lee") Motion for Partial Summary Judgment on the Issue of Liability, and Defendants Sheriff R.M. Williams, Commander C.E. Jett, Deputy Sheriff Steve Eugene Clem, and Deputy Sheriff Lance Evan Barley's (collectively, "Defendants") Motion for Summary Judgment. The Court held a hearing on this matter on Wednesday,

March 28, 2001. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED**.

### I. *Background and Procedural Facts*

Lee, by counsel, filed his Motion for Judgment in the Circuit Court for the City of Norfolk on October 12, 1999. Although many references to "unreasonable" or even "reckless" conduct permeate the record in this matter, this is not a negligence case; rather, Lee's Motion for Judgment purports to state a cause of action under 42 U.S.C. § 1983 for violations of Plaintiff's federal constitutional rights. Specifically, Lee alleged in his Motion for Judgment that Defendants violated his Fourth and Fourteenth Amendment rights by shooting him after he was taken hostage and allegedly used as a "human shield" by two armed robbers who were attempting to escape from a botched robbery attempt at a Food Lion store in Stafford County, Virginia.

Defendants were served on August 3, 2000. On September 1, 2000, Defendants removed the case to this Court on the basis of federal question jurisdiction. On that same date, Defendants filed a Motion to Dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On December 22, 2000, Judge Morgan issued an Opinion and Order denying Defendants' Motion to Dismiss on the grounds that the facts as alleged in Plaintiff's Motion for Judgment could (1) support the determination that, by shooting Lee, Lee was the victim of an unreasonable seizure in violation of the Fourth Amendment; (2) support the conclusion that Defendants' actions were sufficiently shocking to the conscience so as to substantiate a violation of Lee's substantive due process rights under the Fourteenth Amendment; (3) support a cause of action

for failure-to-train against Sheriff Williams and Commander Jett; and (4) support the finding that Defendants were not entitled to qualified immunity.

After discovery by both parties, these cross-motions for summary judgment followed. The parties extensively briefed the matter, and the Court held a hearing on these motions on March 28, 2001. As such, the matter has been fully briefed, supplemented with oral argument, and is now ripe for disposition.

### II. *Substantive Facts*

At all times relevant, Defendant Sheriff R.M. Williams ("Sheriff Williams") was employed as Sheriff of Stafford County, Virginia. In that capacity, Sheriff Williams employed Defendant Commander C.E. Jett ("Commander Jett") as the Commander of the Patrol Division, and Deputy Sheriffs Steve Eugene Clem ("Deputy Clem") and Lance Evan Barley ("Deputy Barley") as Stafford County deputy sheriffs.

Lee was cleaning the floors inside a Food Lion grocery store in Stafford County, Virginia, on October 14, 1997, at approximately 11:40 p.m., when two armed men—later identified as brothers Joel and Desmond Vaughan—entered the store and attempted an armed robbery. A Food Lion employee, hiding from the robbers, called 911 and tipped the police to the robbery-in-progress, and thereafter kept the police dispatch informed as the robbery unfolded. *See* Def.'s Ex. A, Clem Dep., at 59.

Deputy Clem was at the Sheriff's Office when he heard a report of the armed robbery in-progress on his police radio, and he arrived on the scene shortly thereafter. Deputy Clem heard from the dispatcher that the robbers were wearing masks. While en route, Deputy Clem also learned that another law enforcement offi-

cer, Officer Darrell English, was at the scene and positioned in the store's front parking lot. Upon his arrival at the scene, Deputy Clem could not locate Officer English, and therefore Deputy Clem positioned himself "just a little bit inside of the [front] corner of the store but out in front of the Food Lion in the parking lot," and to the right of the front entrance (if facing the entrance) so that he could observe the rapidly unfolding events. *Id.* at 53–54.

The front of the Food Lion store faces to the west, and thus Deputy Clem was positioned at the front of the store near the southwest corner of the Food Lion building. Deputy Clem saw the hooded suspects in the store, switched on the video camera inside of his patrol car, grabbed his shotgun, and exited his vehicle. Deputy Clem also requested back-up units from the Virginia State Police and the Aquia Harbor Police Department. *See id.* at 56–58. Deputy Clem continued to tell the police dispatcher what he observed from the outside of the Food Lion, while the employee inside the Food Lion also continued to relay information to the dispatcher. At this time, Officer Christine Hammond ("Officer Hammond") arrived at the scene and Deputy Clem ordered Officer Hammond to cover the rear of the store. *See id.* at 58–59.

The Vaughan brothers then exited the front of the store and proceeded about 10 to 15 feet into the parking lot. Deputy Clem, in uniform and with his shotgun raised, repeatedly identified himself as "Sheriff's Office" and commanded them to get down on the ground. *See id.* at 63–65. The men looked at Deputy Clem and then ran back into the store. *See id.* Deputy Clem observed the Vaughan brothers return to the lobby area of the store for "just ... a couple of seconds" before the males "took off running towards the rear of the store." *Id.* at 70. Deputy Clem relayed

this information to the dispatcher, and radioed Officer English to assist Officer Hammond in the rear. *See id.*

Still outside the Food Lion, Deputy Clem headed down the side of the store and towards the rear. As he approached the corner of the store to take cover, one of the suspects—later identified as Desmond Vaughan—suddenly appeared three or four feet away. *See id* . at 70–71. Deputy Clem pointed his shotgun at the suspect, told him he was under arrest, and to stop or he would shoot. Deputy Clem did not shoot at that point because he did not see a weapon. *See id.* at 75. The suspect ran to a set of stairs in the rear of the building, near a loading dock, and started going up. At that time, Deputy Clem saw the second suspect—later identified as Joel Vaughan—at the top of the stairs. The second suspect raised his hand and Deputy Clem saw a "muzzle flash" as the suspect shot at Deputy Clem. The shot missed, and Deputy Clem then fired a round at both suspects, but his shot also missed and the door closed with the suspects back inside the Food Lion. Deputy Clem then quickly returned to his vehicle at the front of the store, and took cover beside the left-front fender of his vehicle. *See id.* at 87.

While Deputy Clem was at the rear of the store, Aquia Harbor Police Officer Ray Houser arrived on the scene, and apparently took a position in the front parking lot of the Food Lion, somewhere near the southwest corner of the building. *See id.* at 82. After Deputy Clem returned from the rear of the store, a customer appeared at the front of the store and yelled, "here they come, here they come." Deputy Clem advised the customer to move out of the area, and told Officer Houser to take cover. *See id.* at 84. At the same time, Deputy Barley arrived on the scene and positioned himself in the front parking lot,

near the southwest corner of the Food Lion building, and immediately behind Deputy Clem's position. *See* Def.'s Ex. E, Barley Dep., at 30. Deputy Clem then saw the Vaughan brothers come to the glass vestibule at the front of the store, look in his direction, go back inside the store for approximately one minute, and then return with a third person, later identified as Lee, as their hostage. According to Lee, the Vaughan brothers demanded the keys to his van and took him hostage just prior to exiting the store. *See* Pl.'s Ex. A, Lee Dep., at 10–11. When Commander Jett heard from the dispatcher that the Vaughan brothers had taken a hostage and were attempting to move toward Lee's van, Commander Jett, "knowing that we could not reasonably ensure the hostage's safety if we allowed it to go mobile," got on the radio and directed everyone on the scene "do not let them go mobile." Def.'s Ex. B, Jett Dep., at 26–27.[1]

Deputy Clem saw that one suspect, who was completely dressed in dark clothing and later identified as Desmond Vaughan, had his arm around Lee and a handgun pointed at his head. The other brother—later identified as Joel Vaughan—was wearing camouflage clothing and walked ahead of Desmond Vaughan and Lee, with all three moving in the direction of Lee's van, which was parked 30 to 40 yards to the west and immediately in front of the front entrance to the Food Lion. *See* Clem Dep., at 93–94. Deputy Clem repeatedly shouted at the Vaughan brothers to "get down," but they did not surrender. *See id.* at 94. Joel Vaughan continued to walk

faster than Desmond Vaughan, who was still holding Lee, while Deputy Clem stood with his shotgun shouldered and pointed in the direction of Desmond Vaughan and Lee because his "concern at that point in time was the hostage." *See* Clem Dep., at 89–95. Joel Vaughan reached the van ahead of Desmond Vaughan and Lee, as the latter two were still roughly twenty to thirty yards from the van, back in the direction of the front of the store, with Deputy Clem approximately thirty to forty yards from Joel Vaughan and thirty to forty yards from Desmond Vaughan and Lee. According to Deputy Clem, "It was a triangularization." *See id.* at 102. Deputy Barley, from his position immediately behind Deputy Clem, stated in his deposition that he was fifty yards away from both Joel Vaughan, who was at the van, and Desmond Vaughan, who was still holding Lee and lagging some twenty to thirty yards behind Joel Vaughan. *See* Barley Dep. at 31–32.

The facts up until this point, although not material to the Court's disposition of this matter, are undisputed. The exact sequence of what happened next—after the gunfire between the Vaughan brothers and the police officers started—is less clear, as each of the actors appears to have observed this tense and rapidly evolving situation from different vantages and thus each has a different recollection of the events. Nonetheless, these discrepancies are not material to the Court's disposition of the case since, as the following discussion and especially Lee's own deposition testimony makes abundantly clear, the

---

1. Commander Jett later stated in his deposition that

   [S]afety is in containment ... if they did have a hostage, if they were attempting to go to a vehicle, the containment of that scene would allow us to control it better without putting other people in jeopardy

   ... [T]he thought being if we allow it to go mobile, we cannot ensure that citizen's safety nor the other public out there. By containment, we can isolate, contain, and hopefully at some point ... negotiate or reason with the individuals.

   Def.'s Ex. B, Jett Dep. at 26–27.

most salient fact of the entire matter is not in dispute: Lee was not being held or used as a "human shield" by Desmond Vaughan at the time Lee felt the shots strike him. Rather, it is undisputed that Lee had escaped Desmond Vaughan's grasp and was lying on the ground at the time he was shot. Therefore, Lee was not employed as a "human shield" at the time he suffered his injuries.

At his deposition, Deputy Clem testified that as Joel Vaughan reached the van, Lee tripped or fell to the ground twenty to thirty yards away. *See id.* at 97. According to Deputy Clem, Desmond Vaughan then bent over Lee and apparently attempted to pick him back up. At that moment, according to Deputy Clem, Joel Vaughan looked at Deputy Clem, looked at his brother, Desmond Vaughan, and then turned back to Deputy Clem and fired at least one round directly at Deputy Clem. *See* Clem Dep. at 97–100. According to Deputy Clem, he returned fire at Joel Vaughan, and Joel Vaughan fell to the ground. Deputy Clem's shotgun was loaded with buckshot, although Deputy Clem did not know if the weapon was armed with buckshot or a slug. According to Deputy Clem, "the slug would be used [sic] more of a surgical-style shooting .. if I wanted to get something pinpoint accurate, then I would shoot a slug" as opposed to a buckshot round, which consists of eight or nine pellets. *See id.* at 30. Joel Vaughan allegedly landed on his stomach, and continued to shoot in an arc formation toward Deputy Clem's position at the front of the store. *See id.* at 111–14. According to Deputy Clem, at virtually the same time as his exchange of fire with Joel Vaughan, Desmond Vaughan left Lee on the ground and walked five to seven feet toward Deputy Clem with his weapon raised and pointed at Deputy Clem. *See id.* at 115–16. Deputy Clem, knowing that Lee was still on the ground five to seven feet from

Desmond Vaughan, aimed at Desmond Vaughan's upper torso and head area and fired one shot at him, again using buckshot, although Deputy Clem was unsure whether he was shooting a slug or a round of buckshot at the time he squeezed the trigger. *See id.* at 119. At no time did Officer Clem feel that he was endangering Lee by shooting at either Joel or Desmond Vaughan as Lee was lying on the ground behind Desmond Vaughan's position. Desmond Vaughan then fell to the ground. *See id.* at 120. With Joel Vaughan allegedly still firing shots, Deputy Clem then turned his shotgun on Joel Vaughan and attempted to shoot him, but Deputy Clem was out of ammunition. At that point, Joel Vaughan stopped shooting and threw his weapon down. *See id.* at 121–23.

Deputy Barley's version of the events somewhat corroborates Deputy Clem's. Deputy Barley, from his position immediately behind Deputy Clem, saw Joel Vaughan moving towards the van, heard Deputy Clem yell at the suspects to get down, and saw Lee fall to the ground moments later. Again, Deputy Barley was approximately fifty yards from the van and from Desmond Vaughan's and Lee's position. *See* Def.'s Ex. E, Barley Dep., at 31. Deputy Barley then heard shooting from Joel Vaughan, who had arrived at the van, and, realizing he could not shoot Joel Vaughan because Deputy Clem was in his direct line of fire, Deputy Barley turned his attention back towards Desmond Vaughan and Lee. *See id.* at 29–32. According to Deputy Barley, by the time he turned back towards Desmond Vaughan and Lee, Desmond Vaughan was already lying on the ground approximately four to five yards from Lee and was raising his pistol as if to fire at Deputy Clem. Deputy Barley thought he heard pistol rounds going off, so he aimed at Desmond Vaughan's head and fired two shots at him using a

twelve-gauge shotgun loaded with buck-shot. According to Deputy Barley, Lee was laying on the ground approximately four to five yards from Desmond Vaughan at the time he aimed his shotgun, training his sights on Desmond Vaughan's head and shoulder area, and shot Desmond Vaughan. *See id.* at 70. The shooting ceased immediately, and Desmond Vaughan died from his gunshot wounds soon thereafter. According to both Deputy Clem and Deputy Barley, neither fired a round at either suspect while the suspects were blocked or shielded in any way by Lee. *See id.* at 70; Clem Dep. at 162.

As for Lee's version of these events, in a prior lawsuit against Food Lion and Joel Vaughan, Lee stated in a deposition that, after hearing the police officers yell "Stafford Sheriff's Department" or something similar, he

> tried to get away from [Desmond Vaughan] and I went down and he pulled me back up and we tussled a bit more, and I dropped down, and this time I got away and I fell on the ground and rolled over and started crawling on my stomach, and I started getting hit. I got hit ... and I crawled a little bit farther and I thought [Desmond Vaughan] was shooting at me, but he was lying on the ground with his feet turned out .... And then I started crawling a little bit more and I got shot again, and I kept getting shot ....

Def.'s Ex. D, Lee Dep., at 25–26.

During Lee's deposition in the instant case, however, when Lee was asked about his location when he *heard*—not felt—the first shot, Lee stated:

> A. [Desmond Vaughan] was trying to pull me up and he had me like this and we were going back and he lost his balance and I dropped just before—after the shot went off, the (sic) I went all the way down to the ground

> Q. So you were bent over at the time of the first shot?

> A. No. I dropped down.... I tried to drop down to get away from [Desmond Vaughan] and I didn't go all the way down and he still had me back here and he pulled me up, and as he was pulling me up I heard a shot and then he lost his balance and I went down all the way to the ground then.

Def.'s Ex. F, Lee Dep., at 13–14.

In any event, regardless of Lee's location at the time of hearing the first shot, it is uncontroverted that this shot was not directed at Desmond Vaughan but rather was directed at Joel Vaughan, who was 20 to 30 yards away from Desmond Vaughan and Lee. Thus, Lee's exact position at the time of hearing the first shot is not material to the question of whether Deputies Clem and Barley shot Lee while Lee was allegedly shielding Desmond Vaughan. At the time of hearing the first shot, according to his deposition in the instant case, Lee was not standing straight but rather was "stooping down, going backwards." *See id.* at 14–15. Lee hit the ground and only after he landed on the ground did he feel the first pellet strike him, as he was lying on his stomach, with his head facing towards Deputy Clem's police car. *See* Pl.'s Ex. A, Lee Dep., at 30. In his own words, Lee stated: "I fell down on my side and I rolled on my stomach and at the time I did that is when I got shot." *Id.* at 15. His prior deposition indicates he had "got away" and was "crawling on my stomach" when he got hit. After Lee felt the first shot, he turned back to see if Desmond Vaughan was shooting him, but Desmond Vaughan was lying "flat on his face." *See id.* at 31. Lee allegedly attempted to crawl in the direction of the police cars when he felt another shot. *See id.* Unsure of who was shooting at him, Lee then looked in the direction of Joel Vaughan to

see if Joel Vaughan was shooting him, but he saw Joel Vaughan shooting in the opposite direction. *See id.* at 32–33. Ultimately, and unfortunately, Lee received two pellet wounds to his left leg, one wound to his right leg, small pieces of shrapnel in both ankles, and a wound in his left buttocks. *See* Pl.'s Ex. C.

One other account of the shoot-out is worth mention, that of Officer Houser. At the time of the shoot-out, Officer Houser appears to have been positioned behind a Mazda pick-up truck in the Food Lion parking lot, approximately twenty feet to the northeast of the van that the Vaughan brothers were attempting to escape in. Officer Houser testified in his deposition that, in his opinion, the first shot was fired from a location near the front of the Food Lion, where Deputies Clem and Barley were located, at the same time that Joel Vaughan reached the van. *See* Pl.'s Ex. F, Houser Dep., at 34. Upon hearing this shot, Officer Houser states that Joel Vaughan turned and pointed his pistol in Officer Houser's direction and fired one round. *See id.* Officer Houser returned fire, and Joel Vaughan dropped his gun. *See id.* Officer Houser then moved around the van to take control of Joel Vaughan, and he observed Lee "sitting" on the ground while Desmond Vaughan was "falling forward," in the direction of Lee's van, approximately two to three feet behind Lee. *See id.* At that time, there was no contact between Desmond Vaughan and Lee. *See id.* Joel Vaughan's deposition somewhat corroborates Officer Houser's version of the events in that he states he never fired his weapon in the direction of Deputies Clem and Barley but rather only fired in the direction of Officer Houser. *See* Pl.'s Ex. D, Vaughan Dep., at 35. Also, when Joel Vaughan first observed his brother after the shooting stopped, he saw Desmond Vaughan lying on his stomach with his head and body pointed away from

the entrance to the store and toward Lee's van, while Lee was lying on the ground two to five feet away from Desmond Vaughan, with his head and body pointed away from the van and back toward the direction of the store. *See id.* at 21.

After the shooting stopped, Deputy Clem approached Desmond Vaughan and handcuffed him, while other officers handcuffed Joel Vaughan. Deputy Barley and Officer English attended to Lee, who sustained multiple gunshot wounds. *See* Barley Dep. at 52. According to the Defendants, from the time the Vaughan brothers exited the store with Lee until Joel Vaughan reached the van and allegedly fired the first shot at Deputy Clem, fifteen seconds passed. Seconds later, Desmond Vaughan allegedly aimed at Deputy Clem, and the entire episode was over almost immediately thereafter. *See* Barley Dep. at 51.

According to the police investigative report that was prepared subsequent to the events in question, Desmond Vaughan never fired the nine millimeter Ruger pistol that was found in his hand. This particular model pistol has a maximum capacity of eleven rounds of ammunition, and the weapon as found on Desmond Vaughan contained ten rounds in the clip and one unfired round in the chamber, for a total of eleven rounds. *See* Pl.'s Ex. C. According to the autopsy report, Desmond Vaughan was killed by six pellet wounds to the back that came from four rounds. *See id.* Joel Vaughan received a nonfatal wound to his left thigh. He was armed with a Glock-model nine millimeter with a maximum capacity of 16 rounds of ammunition. The police report indicates that Joel Vaughan fired at least thirteen rounds. *See id.*

Plaintiff, in his brief, also quotes extensively from the Stafford County Sheriff's Department's General Orders in an effort

to show the unreasonableness or reckless-ness of the Defendants' actions. Although, again, this is a constitutional tort case and not a negligence case, some mention of these materials is appropriate. First, the sheriff's department has a general order that states "in any case where an officer is otherwise justified in using deadly force, he shall not use deadly force recklessly or in any place or under any circumstances where injury or death to an innocent by-stander is a reasonable likelihood." Pl.'s Ex. J, at III.A.1. Another general order states that:

> Deadly force shall not be employed EX-CEPT AS A LAST RESORT in any situation in which such force is justified. In Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Su-preme Court ruled that the use of dead-ly force to prevent the escape of a sus-pected criminal is unconstitutional if the suspect appears to be unarmed and not dangerous.

*Id.* at III.A. Finally, the sheriff's depart-ment has in place a general order that prohibits officers from firing "at a suspect when lesser force could be used when the officer believes that the suspect can be apprehended reasonably soon thereafter without the use of deadly force; or when there is any substantial danger to innocent bystanders. (WHEN IN DOUBT, DON'T SHOOT)." *Id.* at VI.D. At their deposi-tions, Deputies Clem and Barley both tes-tified that they were familiar with these general orders. *See* Pl.'s Ex. B, Clem Dep., at 152; Pl.'s Ex. D, Barley Dep., at 17.

Against this factual backdrop, the Court now turns to an analysis of the issues presented.

### III. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judg-ment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to sum-mary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judg-ment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to es-tablish the existence of an essential ele-ment to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such situation, there can be no genu-ine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving par-ty's case renders all other facts immateri-al." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must dem-onstrate that there are specific facts that would create a genuine issue for trial. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, dis-position by summary judgment is appro-priate." *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991).

### IV. *Analysis*

These cross-motions for summary judg-ment present three issues: (1) whether or not Lee was "seized" in violation of the Fourth Amendment; (2) whether Lee's Fourteenth Amendment substantive due process rights were violated; and (3) whether Lee can establish an underlying constitutional violation so as to hold Sheriff Williams and Commander Jett liable under a failure-to-train theory. The Court will address each issue seriatim.

## A. Lee's Fourth Amendment Claim

The Fourth Amendment protects citizens from unreasonable searches and seizures by the state. In order to establish his Fourth Amendment claim, Lee must first prove that Deputies Clem and Barley "seized" him. If the Court determines that Lee was in fact "seized," then the question becomes whether the seizure was reasonable.

The Court's starting point in this analysis is *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). There, the Supreme Court held that a police officer's fatal shooting of a fleeing suspect constituted a Fourth Amendment "seizure." *See id.* at 7, 105 S.Ct. 1694. The *Garner* Court held that "[w]henever an officer restrains the freedom of a person to walk away, he has *seized* that person." *Id.* at 7, 105 S.Ct. 1694 (emphasis added).

■ Four years later, in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), the Court considered the issue of whether police officers violated the Fourth Amendment rights of a decedent who was killed when the stolen car he was driving at night at high speeds crashed into a police roadblock. *See id.* at 594, 109 S.Ct. 1378. The plaintiffs alleged in their Complaint that the roadblock, which consisted of an 18–wheel tractor-trailer placed across both highway lanes, was "effectively concealed" by its placement behind a curve on a dark road and without illumination. *See id.* The police also allegedly positioned a police car, with its headlights on, between the decedent's approaching vehicle and the roadblock so that the decedent would be "blinded" on his approach. *See id.* The district court granted the defendants' motion to dismiss for failure to state a claim, stating that the roadblock was not unreasonable under the circumstances. *See id.* A divided panel of the Ninth Circuit af-

firmed, but for a different reason: the majority held that no "seizure" had occurred. *See id.* The Supreme Court reversed, holding that the decedent was "seized" as that term is used in the Fourth Amendment, and remanded the case to the Ninth Circuit for a determination of whether or not the seizure was reasonable. *See id.* The *Brower* Court held that a

> [v]iolation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful. This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act.... [T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct.

*Id.* at 596, 109 S.Ct. 1378 (internal citations omitted). Consequently, "a Fourth Amendment violation does not occur whenever there is a governmentally caused termination of an individual's freedom of movement ... but only when there is a governmental termination of movement *through means intentionally applied.*" *Id.* at 596–97, 109 S.Ct. 1378. Since the Complaint in *Brower* alleged that the defendants, under color of law, intended to stop the decedent by using a roadblock and succeeded in doing so, the decedent was "seized" under the Fourth Amendment and the Supreme Court remanded the case for consideration of whether the district court properly dismissed the Fourth Amendment claim on the basis that the alleged roadblock did not effect a seizure that was "unreasonable." *See id.* at 599–600, 109 S.Ct. 1378.

In *Rucker v. Harford County*, 946 F.2d 278 (4th Cir.1991), the Fourth Circuit held that a seizure under the Fourth Amendment occurs only when "one is the intend-

ed object of a physical restraint by an agent of the state." *See id.* at 281. Relying on *Brower,* the Fourth Circuit granted summary judgment to police officers where an innocent bystander, who was shot and killed by police officers attempting to stop a fleeing criminal, was not the *"intended object* of a physical restraint by the state." *See id.* at 281. The undisputed evidence was that the police officers were firing at the vehicle being driven by the fleeing criminal, and were unaware of the innocent bystander's presence. *See id.* Under such circumstances, the Fourth Circuit held that the plaintiff's

> [F]ourth [A]mendment claim is directly foreclosed by *Brower,* which held that one is "seized" within the [F]ourth Amendment's meaning only when one is the *intended object* of a physical restraint by an agent of the state. This means that a[F]ourth [A]mendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of a physical restraint. But it does not mean ... that a seizure occurs just so long as the act of restraint itself is intended (here the act of shooting) though it restrains one not intended to be restrained.

*Id.* at 281 (citing *Ansley v. Heinrich,* 925 F.2d 1339, 1344 (11th Cir.1991) (holding that "unintended consequences of government action [cannot] form the basis for a[F]ourth [A]mendment violation"); *El Centro v. United States,* 922 F.2d 816, 822 (Fed.Cir.1990)). Since the undisputed record in *Rucker* was that the innocent bystander was not the intended object of the shooting by which he was injured, the Fourth Circuit held that he was not "seized" under the Fourth Amendment and the defendants were entitled to summary judgment. *See id.; see also Glasco v. Ballard,* 768 F.Supp. 176 (E.D.Va.1991) (Mehrige, J.) (summary judgment in favor

of officer where accidental discharge of firearm not a Fourth Amendment "seizure"); *Hicks v. Leake,* 821 F.Supp. 419 (W.D.Va.1992) (dismissed action against police officer where driver killed in collision was not the object of the chase).

While the determination of whether a "seizure" occurred in a particular case is very much fact specific and necessarily turns on whether the victim was the intended object of a physical restraint, *see Rucker,* 946 F.2d at 281, the facts of *Landol–Rivera v. Cruz Cosme,* 906 F.2d 791 (1st Cir.1990), are substantially similar to the facts of the instant case. There, a hostage held at gunpoint by a criminal was shot when the police attempted to stop the criminal from escaping. The criminal was in the process of robbing a restaurant when he was surprised by police. He grabbed a hostage, fled into the street, and commandeered a passing car. *See id.* at 792. The robber jumped into the driver's seat, with the hostage in his lap. *See id.* When the car moved, the pursuing officers opened fire, and one bullet hit the hostage in the jaw, causing severe injury. *See id.* The hostage then sued the police officers under § 1983 for violations of his Fourth and Fourteenth Amendment rights. *See id.* The district court entered judgment in favor of the hostage, and the police officers appealed. *See id.* The First Circuit reversed the district court, which apparently assumed that the "intent" element of a Fourth Amendment claim could be met by the deliberateness with which a given action is taken. *See id.* at 795. The First Circuit held that "a police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage the Fourth Amendment was designed to govern." *Id.* Since the hostage was "not the object of the bullet that struck

him," the First Circuit held that the hostage's "presence in the car arguably gave the police officers a more compelling need to stop the suspect than if there had been no hostage; the errant bullet did not in these circumstances transform the police action into a seizure." *Id.*

The Fourth Circuit's recent decision in *Milstead v. Kibler,* 243 F.3d 157 (4th Cir. 2001), is also illustrative in showing the difficult hurdles that confront accidental victims of police shootings where recompense is sought via the Fourth Amendment. In *Milstead,* the Fourth Circuit observed that accidental shootings

> generally take[ ] on one of two forms. One is typified by the officer who shoots (with justification) at a suspect but misses, accidentally hitting a bystander. The officer intended to direct deadly force against the suspect but not against the innocent victim. The second form is typified by the officer who shoots (with justification) at the person he believes to be the suspect and hits the intended target, but in fact, the target was misidentified and turns out to be an innocent victim. In that situation, the officer intended to direct deadly force against an innocent victim, but did so under a mistaken belief that he was the suspect.

> Under the first form of mistake, where the seizure is directed appropriately at the suspect but inadvertently injures an innocent person, the innocent victim's injury or death is not a seizure that implicates the Fourth Amendment because the means of the seizure was not deliberately applied to the victim. *See Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 794–95 (1st Cir.1990). In this vein, we have held that when officers shoot at a suspect, but hit a by-

stander instead, no Fourth Amendment seizure occurs. *Rucker v. Harford County, Md.,* 946 F.2d 278, 281 (4th Cir.1991) ("[O]ne is 'seized' within the [F]ourth [A]mendment's meaning only when one is the *intended object* of a physical restraint by an agent of the state" (emphasis in original)).

243 F.3d at 163. The *Milstead* case involved the "second form of mistake," where police officers direct deadly force against an innocent victim under a mistaken belief that the victim is in fact the suspect. The Fourth Circuit went on to conclude in *Milstead* that, where the officer involved had sufficient reason to believe that the innocent victim was in fact an armed assailant that posed a great threat to the officer's safety, the officer's mistake was not unreasonable, and therefore not in violation of the Fourth Amendment. *See id.*

■ In the instant case, as in *Landol–Rivera*—which the Fourth Circuit recently cited with approval in *Milstead*—the undisputed facts show that Lee was not "seized" under the Fourth Amendment. Although some confusion may exist as to whether Lee was already on the ground or chest-high to Desmond Vaughan at the time he heard the first exchange of gunfire between Deputy Clem and Joel Vaughan, some thirty to forty yards away from Lee, this factual dispute is not material to the Court's disposition of this matter. The undisputed evidence is that Lee was not in any way used as a "human shield" at the time that Deputies Clem and Barley opened fire on Desmond Vaughan, and consequently no "seizure" occurred. The deposition testimony of Deputies Clem and Barley both indicate that Desmond Vaughan was at least five to seven feet away from Lee, who was on the ground, when Deputies Clem and Barley aimed and shot at the head and torso of Desmond

Vaughan. *See* Clem Dep. at 115–16; Barley Dep. at 70. Deputy Clem's and Deputy Barley's uncontroverted testimony is that they both aimed at the head and chest of Desmond Vaughan, and that Lee was neither blocking nor shielding Desmond Vaughan in any way at the time Deputies Clem and Barley trained their shotguns on Desmond Vaughan. *See* Clem Dep. at 162; Barley Dep. at 70. By his own testimony, Lee admits that he did not feel the first shot until after he was on the ground and was laying on his stomach: "I fell down on my side and I rolled on my stomach and at the time I did that is when I got shot." Pl.'s Ex. A, Lee Dep., at 15. Therefore it is impossible that Lee was being used as a "human shield" by Desmond Vaughan at the time Lee suffered his injuries; rather, his shooting was entirely accidental. No evidence supports Lee's allegation that he was being used as a "human shield" at the time he was shot, or that either Deputies Clem and Barley fired at Lee with the intention of shooting him. Moreover, Lee has never alleged that he was still engaged as a "human shield" even after he fell to the ground. Thus, the facts of the instant case support the conclusion that Lee was not the object of the shooting and his injuries instead resulted from the unintended consequences of Defendants' actions. Lee's shooting was accidental, not deliberate, and thus not a "seizure" under the Fourth Amendment. "[T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Brower*, 489 U.S. at 596, 109 S.Ct. 1378. As the First Circuit stated in *Landol–Rivera*,

> the Supreme Court in *Brower* carefully distinguished between police action directed toward producing a particular result—in Fourth Amendment parlance, an 'intentional acquisition of physical control'—and police action that simply causes a particular result. Unless the restraint of liberty at issue resulted from an attempt to gain control of the individual ... there has been no Fourth Amendment seizure.

*Id.* at 795.

Again, the undisputed facts demonstrate that Lee was not the intended object of the shooting, rather, the deputies fired their weapons with the intent to shoot Desmond Vaughan in the head and chest. Consequently, since Lee was not "seized," Lee's Fourth Amendment claim is hereby DISMISSED. The Court now turns to Lee's Fourteenth Amendment claim.

## B. *Lee's Fourteenth Amendment Claim*

In addition to his Fourth Amendment claim, Lee also alleges that the Defendants violated his substantive due process rights under the Fourteenth Amendment.

The Supreme Court recently addressed the proper analysis of such a claim in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). There, the decedent was the passenger on a motorcycle that was involved in a high-speed chase with the police. The chase ended when the motorcycle tipped over, however, the police officer in pursuit of the motorcycle was not able to brake in time to keep from running over the passenger, and the passenger was killed. The parents of the decedent brought a § 1983 action against the police department for violation of the decedent's Fourteenth Amendment substantive due process rights. *See id.* at 836–37, 118 S.Ct. 1708. The district court granted summary judgment in favor of the police officer, but the Ninth Circuit reversed, holding that the appropriate degree of fault for substantive due process violations in high-speed chase situations was deliberate indifference to, or conscious disregard for, a person's right to life and personal security. *See id.* at 838–

39, 118 S.Ct. 1708. The Supreme Court reversed, holding that a police officer does not violate substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender; rather, the officer's conduct must "shock the conscience" in order to rise to the level of a due process violation. *See id.* at 854–855, 118 S.Ct. 1708.

To determine what "shocks the conscience," the *Lewis* Court compared situations where officials have a reasonable opportunity to deliberate their actions prior to deciding how to proceed, with situations where officials must "act decisively and ... show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 853, 118 S.Ct. 1708 (quoting *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). In the first circumstance, the Court provided the example of corrections officials who ignore an inmate's serious medical needs. There, "deliberate indifference" would amount to culpable conduct:

> As the very term deliberate indifference implies, the standard is sensible only when actual deliberation is practical ... and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare.

*Id.* at 851, 118 S.Ct. 1708. In contrast, however, the Court held that a much higher standard of fault than deliberate indifference must be shown where officials quell a prison riot or are "forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 853, 118 S.Ct. 1708. In

such circumstances, the official's actions "shock the conscience" *only* if force is employed "maliciously and sadistically for the very purpose of causing harm." *Id.;* *see also Farmer v. Brennan,* 511 U.S. 825, 835–36, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (malicious or sadistic behavior entails unjustifiable, intentional conduct taken with the direct purpose of harming the victim). The *Lewis* Court held that "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the 'large concerns of the governors and the governed.'" *Id.* at 853, 118 S.Ct. 1708 (quoting *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). "[H]igh speed chases with no intent to harm the suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* Consequently, the Court affirmed summary judgment in favor of the police officer involved in the lethal chase: "Regardless whether [the police officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and [the officer] [is] not called upon to answer it under § 1983." *Id.* at 855, 106 S.Ct. 662.

Although the *Lewis* case resolved a split between the circuits over the standard of liability on the part of a law enforcement officer for violating substantive due process in a pursuit case, the shock-the-conscience standard embraced by the *Lewis* Court has long been employed in the Fourth Circuit where law enforcement officers are compelled to make split-second decisions. In *Temkin v. Frederick County Commissioners,* 945 F.2d 716 (4th Cir. 1991), vehicles driven by a fleeing suspect and the police officer in hot pursuit struck

and injured the plaintiff. The Fourth Circuit rejected the plaintiff's substantive due process claim and affirmed summary judgment in favor of the officer, stating that the officer's conduct must "shock the judicial conscience" in order to trigger liability under the Fourteenth Amendment. *See id.* at 720. The court defined conduct that shocks the conscience as that "amount[ing] to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* at 720. While the officer's conduct in *Temkin* may have been "disturbing and lacking in judgment," it nevertheless fell "short of the 'shocks the conscience' standard.'" *Id.* at 723; *see also Howerton v. Fletcher,* 213 F.3d 171, 175 n. 4 (4th Cir. 2000) (holding that under *Lewis* "officers can be held culpable under section 1983 only if they applied force maliciously and sadistically for the very purpose of causing harm .. or with a purpose to cause harm"); *Rucker,* 946 F.2d at 281 (affirming summary judgment in favor of police officers on plaintiff's substantive due process claim where the plaintiff was unintentionally shot while police were attempting to apprehend a fleeing criminal).

A recent decision from the Sixth Circuit demonstrates the correct application of *Lewis* to the situation presented in the instant case. In *Claybrook v. Birchwell,* 199 F.3d 350 (6th Cir.2000), the plaintiff was injured during a shoot-out between police and her armed father-in-law. Police officers in an unmarked car observed both an armed man in a dimly lit parking lot and a vehicle blocking the market's entrance. Suspecting a robbery in progress, the officers radioed police headquarters to request backup while simultaneously moving towards the obstructive vehicle. At that point, a gunman "advanced menacingly behind the hood of the [vehicle] while facing the [officers]." *Id.* at 354. The police ordered the gunman to drop his weapon, however the gunman began shoot-

ing. The officers testified that the gunman shot at them twice before they returned his fire and identified themselves as police officers. The gunman then fled to a more strategic firing position and aimed directly at the officers. In defense, the officers shot the gunman and brought him down. During the shoot-out, the plaintiff, unbeknownst to the officers, was in the vehicle and was injured by a stray bullet. The Sixth Circuit affirmed the summary dismissal of the plaintiff's substantive due process claims against the police officers, finding that the officers "had no opportunity to ponder or debate their reaction to the dangerous actions of the armed man." *Id.* at 360. Applying the "malicious or sadistic" test for conscience-shocking behavior under the mandate of *Lewis,* the Sixth Circuit held that "even if ... the actions of the [officers] violated departmental policy or were otherwise negligent, no rational fact finder could conclude ... that those peace enforcement operatives acted with conscience-shocking malice or sadism towards the unintended shooting victim." *Id.* at 360.

■ As in *Claybrook,* the facts in the instant case fail to support a finding that Deputies Clem and Barley employed force against Lee in a "malicious or sadistic manner" manner that "shocks the conscience" so as to trigger liability under the Fourteenth Amendment for substantive due process violations. The deputies here faced a tense, uncertain, and rapidly evolving situation with armed suspects who, after shooting at Deputy Clem at the rear of the store, retreated back into the store, took a hostage, and were attempting to escape in the hostage's van. The deputies were force to make split-second decisions and to balance "the need to stop [the] suspect[s] and show that flight from the law is no way to freedom" with the risk to Lee. *Lewis,* 523 U.S. at 853, 118 S.Ct.

1708. This is not a situation like the Fourth Circuit foreshadowed in *Rucker* where the court indicated that the victim of an accidental shooting might show conscious-shocking behavior by law enforcement officers if the police shot into a crowd at close range. *See Rucker,* 946 F.2d at 282. As discussed *supra,* there is no evidence that Deputies Clem and Barley intentionally shot or aimed at Lee. Rather, the undisputed evidence is that they fired at Desmond Vaughan only after Lee fell to the ground, and Lee in his own deposition stated that he was not shot until after he was laying on the ground. On these facts, Lee was not injured while Desmond Vaughan was using him as a "human shield," rather, Lee was only injured after he fell away from the control of Desmond Vaughan. At that moment, Deputies Clem and Barley trained their fire on Desmond Vaughan, and shot him dead. On these facts, no reasonable fact finder could conclude that Deputies Clem and Barley acted maliciously or sadistically for the very purpose of causing harm to Lee. *See Lewis,* 523 U.S. at 853, 118 S.Ct. 1708. Rather, although Lee's injuries are unfortunate, the officers' quick reactions may ultimately have saved Lee's life as his fate at the hands of the Vaughan brothers appears highly uncertain.

In *Landol–Rivera,* where the police inadvertently shot a hostage while pursuing a robbery suspect, the First Circuit similarly rejected the hostage's due process claim notwithstanding the officer's knowledge of the hostage. *See Landol–Rivera,* 906 F.2d at 797. Although the First Circuit's decision in *Landol–Rivera* predates the Supreme Court's decision in *Lewis,* the First Circuit's discussion in that case of the need to give great latitude to police officers' conduct in hostage situations is equally applicable to the instant case:

> In this tense, rapidly developing situation, where the fleeing suspect was armed, had threatened to kill the hostage, and had commandeered a car and abducted its driver, the decision to shoot toward the hijacked vehicle, by itself falls far short of demonstrating reckless or callous indifference toward the hostage's rights.
>
> To hold that shooting in such circumstances violates the constitutional rights of a hostage whom the officers are trying to free would be to hamstring seriously law enforcement officers in their efforts to resolve explosive situations. It is inevitable that the police response to violent crime will at times create some risk of injury to others, including innocent bystanders. We decline to hold that the mere presence of risk reflects a callous indifference to the constitutional rights of those individuals potentially harmed. Any other conclusion would both chill law enforcement officers in the performance of their duties and encourage hostage-taking and criminal activity in public settings so as to minimize police intervention.

*Id.* at 797; *see also Milstead,* at 163 ("courts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officers or others").

Even under the First Circuit's less stringent "reckless or callous indifference" standard imposed prior to *Lewis,* the officers in *Landol–Rivera* were not liable for a due process violation. Although Lee, in his brief, cites a 1986 decision from the First Circuit, *Fernandez v. Leonard,* 784 F.2d 1209 (1st Cir.1986), and a 1985 decision from the Fifth Circuit, *Grandstaff v. Borger,* 767 F.2d 161, 164 (5th Cir.1985), in support of his position that the officers in the instant case violated his substantive

due process rights, both the *Fernandez* decision and the *Grandstaff* decision predate the Supreme Court's 1998 decision in *Lewis*, and, since both cases involved intentional shootings, these decisions are of little help. *See Grandstaff*, 767 F.2d at 164 (holding that the officers "consciously disregarded a substantial and unjustifiable risk" when they mistook plaintiff's decedent for a fugitive and killed him); *Fernandez*, 784 F.2d at 1212 (holding that where police officers intentionally used deadly force, firing three times without reason or provocation, at an innocent hostage at point-blank range amounted to conduct that "shocks the conscience"). In the instant case, applying the "shocks the conscience" standard post-*Lewis*, no reasonable fact finder could conclude that Deputies Clem or Barley maliciously or sadistically employed force against Lee in a manner that violated Lee's substantive due process rights, and therefore Lee's Fourteenth Amendment claim is hereby **DISMISSED.**

### C. *Lee's Failure–to–Train Claim Against Sheriff Williams and Commander Jett.*

Lee also alleges that Sheriff Williams and Commander Jett, as Clem's and Barley's supervisors, inadequately trained the deputies. In the Fourth Circuit, "[t]he law is quite clear ... that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation." *Young v. City of Mount Ranier*, 238 F.3d 567 (4th Cir.2001); *Temkin v. Frederick County Commissioners*, 945 F.2d 716, 724 (4th Cir.1991) ("A claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised."). Since, as this Opinion and Order make

clear, Lee's Fourth and Fourteenth Amendment claims are hereby dismissed, Lee's failure-to-train claim must follow. Consequently, Lee's feailure-to-train claim against Sheriff Williams and Commander Jett must is also **DISMISSED.**

### D. *Conclusion*

Since the Court finds no violation of Lee's federal constitutional rights under either the Fourth or Fourteenth Amendment, the Court does not reach the Defendant's alternative argument that Defendants are otherwise entitled to qualified immunity. The undisputed evidence in this case is that Lee was accidentally shot after he fell to the ground, and not while he was shielding or blocking Desmond Vaughan. Consequently, for the reasons more fully set forth herein, Lee's Fourth and Fourteenth Amendment claims, as well as Lee's failure-to-train claim, must fail and Defendants' Motion for Summary Judgment **GRANTED.**

### VI. *Conclusion*

For the reasons stated herein, Plaintiff's Motion for Summary Judgment on the Issue of Liability is **DENIED**, and Defendants' Motion for Summary Judgment is **GRANTED.** Consequently, Plaintiff's Motion for Judgment is **DISMISSED WITH PREJUDICE.**

The Clerk is **DIRECTED** to mail a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**