Filed:  April 5, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 00-1539
(CA-98-75-5)

_____

Matthew Milstead, etc.,

Plaintiff - Appellant,

versus

Chad Kibler, et al.,

Defendants - Appellees.

_____

O R D E R

_____

The court amends its opinion filed March 15, 2001, as follows:

On page 3, third full paragraph, line 7 -- the last word on the page is corrected to read "plaintiff."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

MATTHEW MILSTEAD, Administrator
of the Estate of Mark Milstead,
<u>Plaintiff-Appellant,</u>

v.                                                                    No. 00-1539

CHAD KIBLER; SCOTT PROCTOR;
LESTER WHETZEL,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
James H. Michael, Jr., Senior District Judge.
(CA-98-75-5)

Argued: January 22, 2001

Decided: March 15, 2001

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge, and
Malcolm J. HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Chief Judge Wilkinson and Judge Howard joined.

_____

COUNSEL

**ARGUED:** Jeffrey S. Parker, Great Falls, Virginia, for Appellant.
Mark Dudley Obenshain, WHARTON, ALDHIZER & WEAVER,
P.L.C., Harrisonburg, Virginia, for Appellees. **ON BRIEF:** James R.
Tate, TATE & BYWATER, LTD., Vienna, Virginia, for Appellant.

**OPINION**

NIEMEYER, Circuit Judge:

The Administrator of the Estate of Mark Milstead brought this action under 42 U.S.C. § 1983, alleging that three police officers used excessive force in violation of the Fourth and Fourteenth Amendments when one of the officers accidentally shot Milstead, mistaking him for an assailant who had just shot Milstead and his fiancee. The district court granted the officers' motion for summary judgment, relying on qualified immunity. Finding no constitutional violation, we affirm.

I

Following an emergency call on October 26, 1996, from Mark Milstead to the 911 operator in Shenandoah County, Virginia, Officers Chad Kibler and Scott Proctor, deputy sheriffs in Shenandoah County, and Lester Whetzel, a Woodstock, Virginia town police officer, were dispatched to 59 Indian Camp Trail at Bear Paw Road, in a secluded area in Shenandoah County in response to Milstead's call for help. Milstead reported that he and his fiancee were being attacked by an intruder, Steven Ramey, his fiancee's former boyfriend. The 911 operator reported Milstead's call to the officers, telling them that a man had been shot in the neck and a woman stabbed.[1] The officers received the call shortly after midnight and responded immediately. Upon their arrival at the house, they saw a van parked in front of the house, with the door open, and fresh blood on the van and on the steps leading to the house. They also heard calls for help from inside the house. As Officer Whetzel walked around the house, Officer Proctor, followed by Officer Kibler, proceeded to the front door. Proctor kicked open the door, yelled "police," and took a couple of steps into the house. It is unclear whether Kibler, who was following closely behind, actually made it inside. Both officers saw two figures wrestling on the floor, one of whom withdrew from the altercation and warned them that the other had a gun. The person with the gun

_____

[1] In fact, the 911 operator misreported somewhat the substance of Milstead's call. Milstead had actually reported that his fiancee had been shot and might be dead and that he had been shot in the throat.

2

pointed it at Officer Proctor, whereupon Proctor stopped, began to back up, and fired four shots from his pistol. While backing up, Proctor fell backwards onto the deck outside the door. Kibler, believing that Proctor had been shot, retreated to the outside corner of the house where the steps from the front desk exited, and took a defensive position. Kibler then heard one of the people -- presumably Ramey -- say that he was going to "kill all of you." About 15 seconds after Officer Kibler's initial retreat from the front door, someone came crashing through the door "in a run" and turned toward where Officer Kibler was positioned. Kibler fired two shots, bringing the person down. While the person's hands were about chin level, Kibler did not see anything in them; the only light in the area was an outside wall light behind the person whom Kibler shot.

Officer Kibler explained later that when he fired his gun he believed that the target had to be the assailant Ramey because Milstead had been shot in the neck and could not therefore have been running. He also explained that Ramey had a gun, and that, shortly before the person believed to be Ramey came out of the house, someone said he was going to "kill you all." Kibler concluded that Ramey was making good on this threat.

Still alive, the person Officer Kibler shot told him, "He is still inside." Kibler then realized that he had shot Milstead and not Ramey. After talking with Milstead, Kibler went to the other side of the house and told Officer Proctor that he had shot "the good guy." Proctor told Kibler to return to cover and be watchful for Ramey. After backup arrived several minutes later, the officers removed Milstead and transported him to the hospital, where he died shortly thereafter from the shots fired by Officer Kibler. The officers determined later that Ramey had killed himself with a shot to his head and that Milstead's fiancee had also died.

Milstead's estate commenced this action under 42 U.S.C. § 1983, alleging that Officer Kibler had used excessive force in violation of the Fourth and Fourteenth Amendments and alleging state claims based on the fact that the officers failed to seek medical care in time to save Milstead's life. The district court granted the officers' motion for summary judgment, dismissing the federal claims on qualified immunity and dismissing the state claims because the plaintiff

3

failed to advance sufficient proof in support of them. This appeal followed, challenging only the qualified immunity ruling.

II

The Administrator of the Estate contends that the "unjustified killing of an innocent person by the police . . . who had been summoned . . . to protect and assist" Milstead constituted excessive force, in violation of the Fourth and Fourteenth Amendments, and that, in finding the officers in this case immune from liability, the district court "fail[ed] to consider the full evidentiary record, it improperly weigh[ed] evidence, it fail[ed] to consider the totality of the circumstances, it fail[ed] consistently to apply the correct objective standard of conduct, it fail[ed] to draw all permissible inferences in favor of the non-moving party, and ultimately degenerate[d] into fact-finding by the trial judge." The Administrator argues that if the record is taken as a whole and in a light most favorable to Milstead and if the correct legal standard is applied, "the killing of Mark Milstead was unreasonable as a matter of law."

The legal principles governing qualified immunity analysis are well established. "Police officers are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach `clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sigman v. Town of Chapel Hill, 161 F.3d 782, 786 (4th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The reasonableness inquiry is an objective one, "measured by reference to clearly established law." Harlow, 457 U.S. at 818. At bottom, police officers performing a discretionary function enjoy an immunity that shields them from liability for civil damages unless (1) the officers' conduct violates a federal statutory or constitutional right, and (2) the right was clearly established at the time of the conduct, such that (3) an objectively reasonable officer would have understood that the conduct violated that right. See Wilson v. Layne, 526 U.S. 603, 614-15 (1999); Anderson v. Creighton, 483 U.S. 635, 638-40 (1987); Harlow, 457 U.S. at 818-19.

The "first inquiry" in the analytical structure by which the qualified immunity defense is addressed is whether a violation of a constitu-

4

tional right has been alleged. <u>Siegert v. Gilley</u>, 500 U.S. 226, 231 (1991). Thus, when the qualified immunity defense is asserted, "on summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." <u>Id</u>. (quoting <u>Harlow</u>, 457 U.S. at 818) (internal quotation marks omitted (alteration removed)). And "concomitant" to these determinations is the determination "of whether the plaintiff has asserted a violation of a constitutional right at all." <u>Id</u>. at 232. In <u>Siegert</u>, after establishing this framework, the Court then proceeded to determine first whether the plaintiff alleged a violation of the Constitution.

This analytical sequence was confirmed in <u>Wilson v. Layne</u>, 526 U.S. 603 (1999), in which the Court reiterated that "[a] court evaluating a claim of qualified immunity `must <u>first</u> determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation'" <u>Id</u>. at 609 (emphasis added) (quoting <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999)). This procedure applies even when the non-constitutional issues in the analysis may resolve the immunity issue more easily than the underlying question of constitutional law. <u>See County of Sacramento v. Lewis</u>, 523 U.S. 833, 841 n.5 (1998). Were courts to rule on qualified immunity without determining the constitutionality of the challenged conduct, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional." <u>Id</u>.

Accordingly, in this case we turn first to the question of whether the Administrator has alleged or demonstrated that the conduct of any of the three officers violated Milstead's constitutional rights. Only if we find a constitutional violation may we proceed further in the analysis.**2** <u>See Wilson</u>, 526 U.S. at 609.

───────────────────────────────────────────────────────────────

**2** Because it was Officer Kibler who fired the two shots that ultimately killed Mark Milstead, the analysis focuses through the lens of his perspective. While Officers Proctor and Whetzel are also named defendants, the complaint fails to allege that either violated any of Mark Milstead's constitutional rights. Accordingly, we direct our analysis to whether Officer Kibler deprived Mark Milstead of a constitutional right in shooting him on October 26, 1996.

5

"[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other `seizure' of a free citizen should be analyzed under the Fourth Amendment and its `reasonableness' standard." Vathekan v. Prince George's County, Md., 154 F.3d 173, 178 (4th Cir. 1998) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)) (emphasis in Graham, alteration in Vathekan, internal quotation marks omitted). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), but "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," Graham, 490 U.S. at 396. Thus, in determining the constitutionality of the use of deadly force, a court must decide "whether the totality of the circumstances justified" the use of deadly force in the particular circumstances of the case before it. Tennessee v. Garner, 471 U.S. 1, 8-9 (1985). But the use of deadly force is justified only in circumstances where "it is necessary to prevent the escape [of the suspect] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Id. at 3. An officer's use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," allowing for the fact that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396, 397. Thus, the objective facts "must be filtered through the lens of the officer's perceptions at the time of the incident in question." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). This "limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight" and "limits the need for decision-makers to sort through conflicting versions of the `actual' facts, and allows them to focus instead on what the police officer reasonably perceived." Id.; see also Gooden v. Howard County, Md., 954 F.2d 960, 965 (4th Cir. 1992) (en banc).

In this case, we determine first whether the totality of the circumstances known to Officer Kibler would give a reasonable officer probable cause to believe that the person who crashed through the door in

6

a run and turned toward him "posed a threat of serious physical harm, either to [Officer Kibler] or to others." <u>Garner</u>, 471 U.S. at 11. If we assume for the moment that this person had been Ramey, we believe that the use of deadly force in the circumstances would clearly have been justified. Kibler knew that Ramey had shot Milstead in the neck and stabbed his former girlfriend. He also believed that Ramey had shot Officer Proctor. He knew that Ramey had a gun, and he had heard Ramey shout from within the house that he was going to "kill you all." While Kibler waited the seconds before the believed-to-be assailant came crashing out, he recognized that the only door to the house exited to the deck and down the steps to where he had taken his position. And when the believed-to-be assailant actually came crashing through the door "in a run" and turned toward his position, presumably with a gun, Officer Kibler had no more than a second or two to react. From the perspective of a reasonable officer, Ramey obviously would have posed a deadly threat to both Kibler and the other officers at this dark, remote location, and therefore the use of deadly force against Ramey would have been justified.

But, as it turned out, the person who came crashing through the door was not Ramey, but rather Milstead. There is no dispute that at the time Officer Kibler fired his two shots, he did not know this. Only after he shot Milstead, when Milstead revealed the reality of the situation by his statement, "He is still inside," did Officer Kibler first recognize his mistake. He promptly went to Officer Proctor and told him that he had just shot "the good guy." Thus, just as clearly as Officer Kibler intended to shoot Ramey when he came out the door, he clearly did <u>not</u> intend to shoot Milstead. This leaves us with the question of whether, in making this mistake, Officer Kibler violated Milstead's Fourth Amendment rights.

A mistake of this type generally takes on one of two forms. One is typified by the officer who shoots (with justification) at a suspect but misses, accidently hitting a bystander. The officer intended to direct deadly force against the suspect but not against the innocent victim. The second form is typified by the officer who shoots (with justification) at a person he believes to be the suspect and hits the intended target, but in fact, the target was misidentified and turns out to be an innocent victim. In that situation, the officer intended to

7

direct deadly force against an innocent victim, but did so under a mistaken belief that he was the suspect.

Under the first form of mistake, where the seizure is directed appropriately at the suspect but inadvertently injures an innocent person, the innocent victim's injury or death is not a seizure that implicates the Fourth Amendment because the means of the seizure were not deliberately applied to the victim. See Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989); Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 794-95 (1st Cir. 1990). In this vein, we have held that when officers shoot at a suspect, but hit a bystander instead, no Fourth Amendment seizure occurs. Rucker v. Harford County, Md., 946 F.2d 278, 281 (4th Cir. 1991) ("[O]ne is `seized' within the fourth amendment's meaning only when one is the intended object of a physical restraint by an agent of the state" (emphasis in original)).

But the circumstances in this case fall under the second form of mistake where the officer deliberately directs his force against an innocent victim, believing him, although mistakenly, to be the suspect. This seizure of the innocent victim implicates the Fourth Amendment, but it is not necessarily unreasonable and therefore in violation of the Fourth Amendment. See Hill v. California, 401 U.S. 797, 803-04 (1971) (holding that when police have probable cause to arrest one party and they reasonably mistake a second party for the first, then the arrest of the second party is valid); cf. Vathekan, 154 F.3d at 178 (noting that officer's release of attack dog that "cannot discriminate between a criminal and an innocent person" and that attacks an innocent victim is a seizure implicating the Fourth Amendment).

In Hill, the police officers had probable cause to arrest Hill for burglary, and when they went to Hill's apartment to effect his arrest, Miller, who fit the description of Hill, answered the door. Miller said that he was not Hill but was waiting for him, and produced evidence to prove his identity. But the police, disbelieving Miller, proceeded to arrest him and search the apartment, discovering evidence that ultimately convicted Hill. In upholding the arrest of Miller, the Supreme Court noted that fake identifications were not an uncommon method employed to evade arrest, that Miller resembled Hill, and that Miller's lack of explanation for his mode of entry into the apartment, which

8

had a lock on the door, was not convincing to the officers. In finding both the arrest and the search reasonable and valid under the Fourth Amendment, the Court stated that even though the officers turned out to be "quite wrong," "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." Id. at 804.

The principle that the Supreme Court applied in Hill -- that no Fourth Amendment violation occurs when the "officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time" -- is at the root of several of our holdings concluding that officers' use of force was reasonable in situations where they had probable cause to believe that the suspect had a weapon, but their belief turned out to be mistaken. See, e.g., McLenagan v. Karnes, 27 F.3d 1002 (4th Cir. 1994) (noting the reasonableness of an officer's conduct where the officer shot a suspect upon receiving a warning from a third person that the suspect had a gun, even though the suspect actually had no weapon); Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991) (holding force reasonable where an officer could have had probable cause to believe that a suspect posed a deadly threat even though the suspect turned out to be unarmed); cf. Sigman, 161 F.3d at 788 (concluding that an officer's conduct was reasonable when he shot a suspect, believing that the suspect had a knife, even though onlookers said that they saw no knife). In all of these cases, the objective facts, filtered through the lens of the officer's perception, gave the officer probable cause to believe that his use of force was justified. And when the force would have been justified if the belief had been correct, we have found no Fourth Amendment violation. In short, a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment.

In this case, we believe that Officer Kibler's mistaken understanding did not make his use of force unreasonable. The information that Kibler had at the time he shot Milstead was that (1) a female had been stabbed, (2) Milstead had been shot in the neck, (3) the intruder, Ramey, was armed with a gun, (4) Ramey had apparently shot at Officer Proctor, and (5) Ramey had threatened to kill all of the officers.

9

Blood had already been shed, as Officer Kibler witnessed upon his arrival at the scene. As Kibler waited the few seconds in the dark after Officer Proctor and Ramey apparently exchanged gunfire, he did not know where Milstead or Ramey was. He did know, however, that Milstead had been shot in the neck, and therefore he believed that, when someone crashed through the front door in a run, it had to be Ramey. Although he did not see a gun, he knew that Ramey had a gun only seconds earlier. Moreover, because of the poor lighting, he could not be sure that he was not holding a gun. In the second or two after the person's crashing exit through the door, Kibler had to decide whether to fire. In this instant of mortal danger, he fired, intending to end the threat posed by Ramey. His mistake was tragic.

But courts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officers or others. See Graham, 490 U.S. at 396-97; McLenagan, 27 F.3d at 1007-08. While we know in hindsight that Officer Kibler mistakenly shot Milstead, instead of Ramey, this mistake does not negate the justification for the use of deadly force where Officer Kibler had an objectively reasonable belief that Milstead was Ramey. "[T]he Fourth Amendment addresses `misuse of power,' not the accidental effects of otherwise lawful conduct." Brower, 489 U.S. at 596 (internal citation omitted).

Because no Fourth Amendment violation was shown, we need not proceed with the remainder of the qualified immunity analysis, i.e., to determine whether the right was clearly established at the time of the conduct or to resolve whether the contours of such a clearly established right were sufficiently clear that a reasonable officer would understand that he was violating the right. See Wilson, 526 U.S. at 614-15.

We acknowledge that the facts of this case -- triggered by the criminal conduct of Ramey -- sound a tragic knell of classical proportions. Ramey murdered Milstead's fiancee, who was pregnant. Officer Kibler attempted to perform his duty to assist Milstead, but instead killed him by mistake. And Ramey in the end committed suicide. Officer Kibler and the families of the innocent, as well as the family of the suspect, must live with these painful memories. Pre-

10

sented with this lawsuit by Milstead's family against Officer Kibler, we can only decide the limited legal question of whether a constitutional lawsuit lies against Officer Kibler. We conclude that it does not.

AFFIRMED

11