Stephen R. **FLYNN** and Melissa Flynn, Plaintiffs,

v.

Brandon **MILLS**, Lawrence Conley, City of Indianapolis, Indianapolis Police Department, Marion County Sheriff's Department, Jerry L. Barker, Jack L. Cottey, Defendants.

No. 1:03–CV–00515–TAB–JD.

United States District Court, S.D. Indiana, Indianapolis Division.

March 25, 2005.

Timothy V. Clark, Gregory H. Coleman, Clark Coleman & Freeman, Indianapolis, IN, for Plaintiffs.

Jeffrey S. McQuary, Shatrese M. Flowers, Office of Corporation Counsel, John F.

Kautzman, John C. Ruckelshaus, Ruckelshaus Roland Kautzman Blackwell & Hasbrook, Indianapolis, IN, for Defendants.

### ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

BAKER, United States Magistrate Judge.

### I. Introduction.

On the evening of September 17, 2001, a police pursuit of armed suspects ended with the shooting death of a police officer and, in a case of mistaken identity, the non-fatal shooting by police of a civilian witness. That witness, Plaintiff Stephen R. Flynn, filed the instant action claiming, among other things, unreasonable seizure and the use of excessive force in violation of his constitutional rights. Defendants argue that they are entitled to summary judgment under the doctrine of qualified immunity. For the reasons stated below, Defendants' motion for summary judgment is GRANTED.

### II. Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Illinois Cent. R. Co. v. South Tec Development Warehouse, Inc., 337 F.3d 813, 816 (7th Cir.2003). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Abrams v. Walker, 307 F.3d 650, 653 (7th Cir.2002), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Butera v. Cottey, 285 F.3d 601, 605 (7th Cir.2002).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Michael v. St. Joseph County, 259 F.3d 842, 845 (7th Cir.2001). To successfully oppose Defendants' motion for summary judgment, Plaintiffs must do more than raise a "metaphysical doubt" as to the material facts. See Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir.2001). A scintilla of evidence in support of the non-movant's position is not sufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252, 106 S.Ct. 2505.

### III. Background.[2]

On September 17, 2001, while off duty working private security in his marked

---

1. In response to Defendants' motion for summary judgment [Docket No. 38], Plaintiffs filed a "Motion in Opposition to Defendants' Motion for Summary Judgment" [Docket No. 44] and a "Brief in Opposition to Defendants' Motion for Summary Judgment." [Docket No. 45]. Plaintiffs' motion is procedurally improper and is, therefore, denied. It is unnecessary for a party to file a separate motion requesting that the Court deny an earlier motion by an opposing party. Such practices could potentially create confusion over briefing schedules and the determination of when a motion is fully briefed.

2. The facts are either undisputed or viewed in a light most favorable to Plaintiffs, the nonmoving parties. In addition, this background section is a brief overview of the facts, not an exhaustive recitation of all material facts.

patrol car, Marion County Sheriff's Deputy Lawrence Conley overheard a radio broadcast regarding the pursuit of a fleeing vehicle by another Sheriff's deputy. [Conley Stmt., pp. 1–2]. Conley responded to the call, activated his lights and sirens, and joined the chase. [Conley Stmt., pp. 1–2]. A suspect began shooting out of the passenger side of the car at the deputies in pursuit. [Conley Stmt., p. 3]. At the time, Conley believed that the man shooting was a fair complected black male. [Conley Stmt., p. 3]. Conley also observed that the man had an AK–47 assault rifle and he appeared not to be wearing a shirt. [Conley Stmt., p. 4]. Conley made these observations during the pursuit at speeds of approximately 40 miles per hour. [Conley Dep., p. 77]. It was dark during the pursuit and the suspects' car had tinted windows. [Conley Dep., pp. 28, 78]. Conley saw only the suspects' arms. [Conley Dep., p. 79].

Conley maintained his pursuit while he continued to receive fire from the passenger side of the fleeing vehicle. [Conley Stmt., p. 4]. The pursuit led to the area of 32nd Street and Brouse Avenue. Conley attempted to radio his position, but was unable to do so because of heavy radio traffic. [Conley Stmt., p. 5]. After stopping to speak with a supervisor, Conley got back in his car, turned onto 33rd Street off of Brouse and parked at a dead end. [Conley Stmt., p. 5]. He retrieved his shotgun from the trunk and moved with several other officers toward what appeared to be the headlights of the suspects' vehicle, which had come to a stop after crashing through a fence and into a house on Baltimore Avenue. [Conley Stmt., p. 5; Mills Stmt., p. 10].

Meanwhile, while on duty at Indianapolis Police Department's ("IPD") North District headquarters, detective Brandon Mills also overheard a radio broadcast concerning the pursuit of a fleeing vehicle and that shots had been fired. [Mills Dep., pp. 21–22; Mills Stmt., p. 6]. Mills got in his car and drove toward the area of the chase. [Mills Dep., p. 22; Mills Stmt., p. 6]. As Mills arrived in the area of the pursuit, he heard radio traffic that a deputy had been shot and that the pursuit had ended. [Mills Stmt., p. 6]. Mills parked his car on 32nd Street, put on a bullet-proof vest with the words "POLICE" written on it, and ran toward 33rd and Brouse because he heard radio reports that officers there needed help. [Mills Stmt., p. 7]. During this time, Mills could hear automatic weapon fire. [Mills Stmt., p. 8].

Mills met Conley and several other police officers at the intersection of 33rd and Brouse. [Mills Stmt., p. 8; Conley Stmt., p. 5]. Together, Conley and Mills approached the suspects' crashed vehicle, a white Monte Carlo. [Conley Stmt., p. 5; Mills Stmt., p. 10]. While Conley covered him, Mills checked the car to make sure no one was inside. The vehicle was empty. However, Mills saw an assault rifle in the back seat and a magazine pouch capable of carrying multiple magazines of ammunition. [Mills Stmt., pp. 11–12]. Mills communicated that the car was clear and the two took refuge behind a fence, where they could see across Baltimore Avenue, from which the sounds of gunfire were coming. [Mills Stmt., p. 12; Conley Stmt., p. 6].

From behind the fence Mills and Conley saw a light skinned black male lying on his stomach in a driveway. [Conley Stmt., p. 6; Mills Stmt., p. 13]. Mills radioed control that he had a suspect and asked for a SWAT team to assist. However, he did not receive a response. [Mills Dep., p. 24; Mills Stmt, p. 13]. As they watched, the individual—later identified as Flynn—began to crawl. Mills and Conley rounded the fence for a better view. [Mills Dep., p. 24; Conley Stmt., p. 6]. Mills observed a gun in the individual's left hand. [Mills

Dep., pp. 24–25]. Conley also saw a gun, though he recalls it was in the individual's right hand. [Conley Dep., p. 41; Conley Stmt., pp. 6–7].

Earlier, Flynn began the evening in his home with his wife, Plaintiff Melissa Flynn, when he heard gunfire. [Flynn Dep., pp. 15–16]. Flynn went outside to see what was happening and observed two men running down Baltimore Avenue. One of the men was carrying an AK–47 automatic rifle. [Flynn Dep., pp. 16–17]. Flynn went back into his house, told his wife to call 911, and retrieved his handgun. [Flynn Dep., p. 18]. He then went back outside to check on his mother and nephew who lived next door.

While outside, Flynn stopped a passing police car, containing officers Tracy Knecht and Charles Martin, to explain what he had observed. [Flynn Dep., pp. 19, 25–26; Knecht Aff., ¶¶ 4–5]. Immediately after Knecht and Martin drove away, Flynn saw two more police cars and flagged them down. [Flynn Dep., pp. 19, 26]. Officers Mark Rand and Tim Abrams were in the first car and Officer Frank Wooten was in the second. [Wooten Dep., pp 11–13]. Flynn told them that two men had just jumped over his mother's fence and that one had an assault rifle and ran across the street. [Flynn Dep., p. 27].

At the time, Flynn was dressed only in shorts and sandals. During his contact with the various police officers, Flynn did not conceal his handgun, but held it at his side in his right hand and in plain view. [Flynn Dep., pp. 89–91, 93]. None of the officers inquired about Flynn's possession of his handgun. [Flynn Dep., p. 93]. In addition, no police officer with whom Flynn had contact ever instructed Flynn to go back inside his house. Instead, the officers continued to seek information from Flynn regarding the location and identity of the suspects with the automatic weapon. [Flynn Dep., pp. 19, 26, 44–45, 91].

While Flynn was still conveying information to the officers, 10 to 20 more rounds were fired from an automatic weapon. [Flynn, Dep., pp. 19, 94–95; Rand Dep., p. 15]. The shots were coming from Allen Dumpworth, one of the suspects, who without the officers' knowledge had crossed Baltimore Street and started shooting at them. [Wooten Dep., p. 18]. Dumpworth was hiding behind some bushes at the corner of a house across the street from where he had crashed his car. [Wooten Dep., p. 20].

When the shooting started, Wooten and Abrams took cover behind Wooten's car. [Wooten Dep., p. 22; Flynn Dep., pp. 19, 94–95]. Rand initially took cover behind a nearby house. However, he made his way back to his car to retrieve his shotgun. [Rand Dep., p. 16; Flynn Dep., pp. 19, 94–95]. Flynn dropped to the ground on his stomach in a prone "shooting" position. [Flynn Dep., p. 94]. Wooten then developed a plan to extricate Flynn, Abrams, and himself from the gunfire by having Flynn crawl to his police car where he and Abrams were taking cover. [Wooten Dep., pp. 39–41, 47; Wooten Stmt., p. 15]. Wooten yelled instructions for Flynn to crawl to his car and Flynn began crawling. [Wooten Stmt., p. 15, Wooten Dep., p. 48, Flynn Dep., p. 96].

Meanwhile, Mills and Conley were behind the fence watching Flynn when they noticed him starting to move in the direction of IPD officers Wooten and Abrams sheltering behind a police car. [Mills Dep., pp. 24–25; Mills Stmt, p. 14, Conley Stmt., p. 6; Wooten Dep., p. 22]. Conley and Mills observed that the officers had their backs to Flynn and believed that the officers were in immediate danger. [Conley Stmt., p. 6; Conley Dep., p. 63; Mills Dep., p. 25; Mills Stmt., p. 16]. Conley illuminated Flynn with his flashlight and shouted "Marion County Sheriff's De-

partment. Stop! Stop!" [Conley Stmt., p. 7; Conley Dep., p. 41]. However, Flynn did not hear a warning from either Conley or Mills. [Flynn Dep., p. 99]. When Flynn continued to crawl toward the officers, Conley fired his shotgun at him. [Conley Stmt., p. 7]. Simultaneously, Mills fired his pistol. [Mills Dep., p. 25]. At the time that he fired, Conley believed that Flynn matched the description of the suspect he had witnessed in the earlier car chase. [Conley Dep., pp. 86–87].

An agitated Flynn yelled at Wooten that he had been shot, despite following Wooten's instructions to crawl to the car. [Wooten Dep, p. 73]. Wooten responded, "Stay right there. I'll come to you." [Wooten Dep., p. 73]. However, Flynn continued to crawl toward Wooten. [Wooten Dep., pp. 73–74]. Mills commanded Flynn to stop and to put down the gun. Flynn failed to comply and Mills fired a second volley. [Mills Dep., p. 25]. Flynn had his gun in his left hand when he was struck by the second volley. [Flynn Dep., p. 70]. Wooten had crawled toward Flynn after the first shots and was also struck by the second volley. He was approximately one foot away from Flynn at the time. [Wooten Dep., pp. 60, 75].

A "couple of minutes" before the shooting of Flynn, Rand heard Mills state on the radio that Mills had observed a black male suspect lying down. [Rand Dep., p. 32; Rand Stmt., p. 5]. As a result, Rand got on his radio and stated several times, "that's our witness, he's our witness, he saw the shooter." [Rand Dep., p. 32]. Control repeated Rand's communication. [Rand Stmt., p. 5]. Similarly, when Wooten

saw Mills and Conley illuminate Flynn with a flashlight, he stated into his radio, "Don't engage the civilian." [Wooten Dep., pp. 38–39]. Additionally, both Rand and Wooten shouted at Mills and Conley—as opposed to in their radios—not to engage the witness. [Wooten Dep., pp. 45–46; Wooten Stmt., p. 17; Rand Stmt., p. 8]. At the time, Rand was approximately 15 feet from Mills and Conley. [Wooten Dep, pp 37–38].

Neither Mills nor Conley heard the warnings that Flynn was a civilian witness until it was too late. [Mills Dep., pp. 57–58; Conley Dep., p. 60; Conley Stmt., p. 7]. Conley did not realize that Flynn was not a suspect until he heard a police officer shouting that Flynn was a witness and to stop shooting. [Conley Dep., p. 60; Conley Stmt., p. 7]. Likewise, Mills heard Wooten's and Rand's warnings only after he had fired on Flynn. [Mills Dep., p. 58].

## IV. Discussion.

In their amended complaint, Plaintiffs raise seven claims for relief against seven different Defendants.[3] Plaintiffs allege: (1) the unreasonable seizure of Flynn by use of deadly force; (2) excessive force; (3) false arrest; (4) false imprisonment; (5) negligent use of firearms by Defendants Mills and Conley; (6) negligent entrustment of firearms issued to or qualified for use by Defendants Mills and Conley; and (7) the loss of consortium by Melissa Flynn. Defendants argue a variety of defenses. With respect to Plaintiffs' federal claims, Defendants contend that Conley and Mills are entitled to qualified immuni-

---

3. In their opposition brief, Plaintiffs "agree and stipulate that the Chief of Police for IPD and the Sheriff of the MCSD no longer should be parties in this action." [Docket No. 45, p. 13 n. 1]. Accordingly, the claims against Jerry L. Barker and Jack L. Cottey are dismissed with prejudice. In addition, Plaintiffs have also named the Indianapolis Police Depart-

ment as a Defendant in this matter. However as Defendants note, "the Indianapolis Police Department is a municipal department not separately suable from the City ...." *Gillespie v. City of Indianapolis,* 13 F.Supp.2d 811, 816 (S.D.Ind.1998). Thus, the Indianapolis Police Department is also dismissed with prejudice.

ty, that probable cause existed to arrest Flynn, and that the amount of force utilized by Conley and Mills was reasonable under the circumstances. For the reasons stated below, the Court agrees with Defendants. Accordingly, summary judgment is appropriate with respect to all claims.

### A. Plaintiffs' Federal Claims and Qualified Immunity.

Qualified immunity shields officers from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Leaf v. Shelnutt,* 400 F.3d 1070, 1079–80 (7th Cir. 2005), *quoting Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). A two-part inquiry is utilized in determining whether qualified immunity applies. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, taking the facts in a light most favorable to the non-moving party, the Court asks the threshold question whether the facts alleged show the officer's conduct violated a constitutional right. If so, the Court must determine "whether the right was clearly established." *Id.* at 201, 121 S.Ct. 2151; *Leaf,* 400 F.3d at 1079–80.

Although the Plaintiffs clothe their federal claims under various guises, i.e. unreasonable seizure, excessive force, false arrest, and false imprisonment, the critical inquiry in determining whether Conley and Mills are entitled to qualified immunity is whether their actions were reasonable under the circumstances known to them at the time.[4] Regardless of whether evaluated under an unreasonable seizure or excessive force analysis, the Court finds that Mills' and Conley's actions were reasonable under the circumstances. Thus, both are entitled to qualified immunity.

#### 1. Unreasonable Seizure.[5]

In actions involving claims of false arrest, "an officer is entitled to qualified immunity if the officer actually had probable cause or, if no probable cause existed, if a reasonable officer could have mistakenly believed that probable cause existed." *Humphrey v. Staszak,* 148 F.3d 719, 725 (7th Cir.1998). *See also Jacobs v. City of Chicago,* 215 F.3d 758, 772 (7th Cir.2000) ("An official seizure is ordinarily unreasonable unless it is supported by probable cause, even where no formal arrest is made."). Under these circumstances, the Court's consideration of probable cause and qualified immunity are closely related.

> Whether police officers had probable cause to arrest a suspect and whether they are entitled to qualified immunity for the arrest are closely related questions, although qualified immunity provides the officers with an "additional layer of protection against civil liability" if a reviewing court finds that they did not have probable cause.

*Williams v. Jaglowski,* 269 F.3d 778, 781 (7th Cir.2001), *quoting Hughes v. Meyer,* 880 F.2d 967, 970 (7th Cir.1989). *See also Leaf,* 400 F.3d at 1079–80 n. 8 (noting that reasonableness standards for determining constitutional violations and qualified immunity are distinct; qualified immunity is

---

**4.** Plaintiffs' claims of "unreasonable seizure," "false arrest," and "false imprisonment" are essentially synonymous under the facts of this case. Each of these claims implicates the alleged unreasonable seizure of Flynn when he was shot by Conley and Mills. Moreover, it is undisputed that Conley and Mills did not "arrest" Flynn. Rather, they shot him because they mistakenly thought he was a sus-

pect. Accordingly, Flynn's claim is most appropriately described as one for unreasonable seizure.

**5.** In their opposition, Plaintiffs appear to focus solely on their claim of excessive force. Nonetheless, the Court addresses Plaintiffs' unreasonable seizure claims.

applicable even when constitutional violations occur when officers make "reasonable mistakes as to the legality of their actions") (citation omitted).

■ As in this case, where a plaintiff disputes probable cause in a § 1983 false arrest claim, the Seventh Circuit has outlined the analysis as follows:

> With an unlawful arrest claim in a § 1983 action when a defense of qualified immunity has been raised, we will review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed. Courts have referred to the second inquiry as asking whether the officer had "arguable" probable cause. Arguable probable cause exists when "a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." Officers are entitled to summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken. The court should ask if the officer acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact. *Humphrey,* 148 F.3d at 725 (internal citations omitted). *See also Wollin v. Gondert,* 192 F.3d 616, 623 (7th Cir.1999) ("[i]n recognition of the endless scenarios confronting police officers in their daily regimen, courts evaluate probable cause 'not on the facts as an omniscient observer would perceive them *but on the facts as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard.'* ") (citation omitted). Here, given the undisputed facts known to Mills and Conley, a reasonable police officer could have believed that probable cause existed, therefore entitling the them to qualified immunity.[6]

The undisputed facts reveal that at the time of the seizure,[7] Conley knew that: (1) a police chase involving armed suspects ended in the area of Brouse Avenue and 33rd Street; (2) at least one of the suspects was a light-complected black male that appeared not to be wearing a shirt; (3) Flynn was a light-complected black male in the vicinity of the suspects' crashed vehicle; (4) Flynn was not wearing a shirt; (5) Flynn was crawling on the ground near several IPD officers who appeared to have their backs turned; and (6) Flynn held a handgun.[8] Mills was aware

---

6. "The resolution of the question of whether probable cause exists typically falls within the province of the jury, but 'a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Lanigan v. Village of East Hazel Crest, Ill.,* 110 F.3d 467, 473 (7th Cir.1997) (citation omitted).

7. The manner in which Mills and Conley seized Flynn, i.e. the use of deadly force, is discussed below.

8. In his opposition, Flynn makes much of the fact Mills saw the gun in Flynn's left hand

and Conley saw the gun in Flynn's right hand. Moreover, Flynn notes that Officer Frank Wooten "testified that at no time during his contact with Mr. Flynn on September 17, 2001, did he at anytime observe Mr. Flynn with a firearm in his hand or on his person." [Docket No. 45, p. 3]. None of this raises a question of material fact. It is undisputed that Flynn had a gun and that both Conley and Mills observed Flynn with a gun. Whether the gun was in Flynn's left or right hand does not alter the chain of events or the ultimate conclusion by the Court. However, according to Flynn—and in the interest of accuracy—Flynn held the weapon in his left

of the same facts, with the exception that his knowledge of the suspect's description was limited to a black male. [Mills Dep., pp. 95–96]. Specifically, Mills was not aware that the suspect may not have been wearing a shirt. [Mills Dep., p. 99].

Despite these undisputed facts, Flynn offers a variety of reasons why probable cause did not exist and thus why Mills and Conley are not entitled to qualified immunity. For instance, Flynn argues that: (1) Wooten and Rand testified that they never considered Flynn a threat and that Flynn was assisting them in identifying and locating the real suspects; (2) Wooten and Rand testified that Flynn had not engaged in criminal activity and was not attacking any officer; and (3) Flynn, Wooten, and Rand provide a different version of events than that of Mills and Conley, i.e. that Wooten was facing Flynn the entire time Flynn was crawling toward Wooten (in contrast to Mills and Conley's testimony that Abrams and Wooten's backs were turned) and that Wooten and Rand repeatedly yelled radio and verbal commands a short distance from Mills and Conley indicating that Flynn was a civilian witness. None of these facts create an issue of material fact for a jury.

First and foremost, probable cause is determined by considering the facts and circumstances known to Mills and Conley at the time of the seizure. *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir.2003). Accordingly, what Wooten and Rand knew—and what Mills and Conley found out later—is not relevant to the inquiry. Moreover, that Mills and Conley could have heard Wooten and Rand's shouts or radio

communications regarding Flynn's civilian witness status does not change the undisputed fact that Mills and Conley did not hear those warnings.[9] Plaintiffs, as the non-moving parties, are entitled to have all reasonable inferences drawn in their favor at the summary judgment stage. However, it simply is not reasonable to conclude that Mills and Conley heard Rand's and Wooten's shouts and/or radio communications—and therefore knew that Flynn was an civilian witness—and shot Flynn nonetheless. In short, a reasonable police officer standing in Mills' and Conley's shoes could have believed that probable cause existed to seize Flynn. Accordingly, Mills and Conley are entitled to qualified immunity on Flynn's unreasonable seizure claims.

## 2. Excessive Force.

As noted above, the Court's analysis of Flynn's excessive force claim is similar to its analysis of his unreasonable seizure claim in that both involve an objectively reasonable test. The Seventh Circuit Court of Appeals has described the excessive force analysis as follows:

> While "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Fourth Amendment prohibits the use of excessive force during the execution of a seizure, *id.* at 395, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (holding that the Fourth Amend-

hand while he was crawling toward Wooten and Abrams. [Flynn Dep., pp. 96–97].

9. The parties expend considerable effort detailing whether or not MCSD and IPD radio channels were "patched" to allow communications between the departments. For summary judgment purposes, the Court assumes

that the channels were indeed patched. However, as explained above, this does not create a material issue of fact regarding whether Mills and Conley actually heard Rand and Wooten's warnings. Moreover, it is undisputed that radio traffic was heavy during the relevant time period, causing communication difficulties.

ment's objective reasonableness test is the appropriate standard for evaluating excessive force claims). In order to decide whether the amount of force used during a seizure is "excessive," we examine the totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake. *See Lanigan v. Village of E. Hazel Crest,* 110 F.3d 467, 475 (7th Cir.1997). The Fourth Amendment test is an objective one, where the officer's subjective good or bad intentions do not enter into the analysis. *See Graham,* 490 U.S. at 397, 109 S.Ct. 1865. Instead, we consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. We also consider whether the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. *See McDonald v. Haskins,* 966 F.2d 292, 292–93 (7th Cir.1992). In the end, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." *Id.* at 294 (*citing Wilkins v. May,* 872 F.2d 190, 193 (7th Cir.1989)).

*Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir.2000). In addition, "[a]n officer's determination of the appropriate level of force to use must be measured from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Muhammed v. City of Chicago,* 316 F.3d 680, 683 (7th Cir.2002) (citation omitted).

█ Relying on the same arguments discussed above, Plaintiffs contend that "Mills and Conley had no probable cause whatsoever to intentionally and deliberately use deadly force and shoot Mr. Flynn to seize him even if they reasonably believed he was an 'armed suspect.' " [Docket No. 45, p. 20]. The Court disagrees. As noted above, at the time of the shooting, Mills and Conley knew that an armed suspect matching the description of Flynn was in the general vicinity. When Mills and Conley came upon Flynn, he was holding a handgun and crawling toward two IPD officers that Mills and Conley believed were unaware of Flynn's presence.[10] Based on the facts known to them at the time, Mills and Conley believed that Abrams and Wooten were in immediate danger of being shot by Flynn and, therefore, used deadly force to stop the threat. The Court finds this to be a reasonable determination.

Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) "poses a threat of serious physical harm, either to the officer or to others," or (2) "committed a crime involving the infliction or threat-

10. Again, Flynn attempts to create an issue of fact by pointing to Wooten's and Flynn's testimony that they were facing each other. Assuming this to be true, that Mills and Conley were mistaken about this fact does not make their actions any less reasonable. It is undisputed that Flynn had a handgun and was crawling toward IPD officers. It was, therefore, not unreasonable for Mills and Conley to believe that the IPD officers, namely Abrams and Wooten, were in immediate danger. "As aptly noted in *Young v. City of Killeen, Tx.,* 775 F.2d 1349, 1353 (5th Cir.1985), *'no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts.' " Sherrod v. Berry,* 856 F.2d 802, 805 (7th Cir. 1988).

ened infliction of serious physical harm" and is about to escape.... Thus, "when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Muhammed*, 316 F.3d at 683 (citation omitted). This is exactly the situation that presents itself here. Although Plaintiffs take issue with Mills' and Conley's actions, Plaintiffs' arguments amount to impermissible hindsight. *Id.*

It is undisputed that Flynn was a civilian witness and not guilty of any crime. It is also undisputed that Mills and Conley intentionally shot Flynn. The Court has not found a Seventh Circuit Court of Appeals decision that addresses quite this type of situation. However, in *Milstead v. Kibler*, 243 F.3d 157, 164 (4th Cir.2001), the Fourth Circuit Court of Appeals explained that "[t]his seizure of the innocent victim implicates the Fourth Amendment, but it is not necessarily unreasonable and therefore in violation of the Fourth Amendment." In affirming summary judgment in favor of a police officer based on qualified immunity, *Milstead* found that "a mistaken understanding of the facts that is reasonable in the circumstance can render a seizure based on that understanding reasonable under the Fourth Amendment." 243 F.3d at 165. Such is the case here.

Plaintiffs also argue that Mills and Conley's actions were unreasonable because, according to Flynn, they did not provide warnings before shooting. However, as Defendants point out, even accepting Plaintiffs' facts as true, Mills' and Conley's use of deadly force was not unreasonable. The Seventh Circuit Court of Appeals has explained that "*[w]henever possible under the circumstances,* the officer should try to identify himself as a law enforcement officer to the suspect." *Muhammed*, 316 F.3d at 683 (emphasis added). The exigency of the situation as known to Mills and Conley excuse any lack of warning. *See Milstead*, 243 F.3d at 165 ("courts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstance, when inaction could threaten the safety of the officers or others.").

Finally, noting that Wooten had crawled within approximately one foot of Flynn, Plaintiffs argue that "[i]t was ... 'objectively unreasonable' for defendants Mills and Conley to fire a second volley at Mr. Flynn after at least a one (1) minute period [after] the first volley." [Docket No. 45, p. 18]. In support of this proposition, Plaintiffs cite to Wooten's deposition. *See* [Wooten Dep., pp. 73–77]. It is true that Wooten stated that Flynn "stayed there for a minute." [Wooten Dep., p. 73]. However, within the context of Wooten's testimony, it is apparent that this was merely a figure of speech. Wooten's statement was not in response to a direct question regarding the timing of the shots, and Plaintiffs cite to no other evidence to support this proposition. In short, it is not reasonable to infer that "at least a minute" passed between the first and second volleys. In any event, it is undisputed that after the first volley, Flynn did not put down his weapon and continued to crawl toward the officers. Accordingly, the Court cannot conclude that the second volley was unreasonable under the circumstances.

In short, Mills' and Conley's actions did not violate the Fourth Amendment. Accordingly, the Court need not proceed to the second part of the qualified immunity analysis, namely whether the constitutional right was clearly established at the time of the alleged violation. *Milstead*, 243 F.3d

at 165. Mills and Conley are entitled to qualified immunity.[11]

## B. Plaintiffs' Remaining State Claims.

In addition to Plaintiffs' federal constitutional claims, Plaintiffs have alleged state law tort claims for excessive force, false arrest, false imprisonment, negligent use of firearms, negligent entrustment, and loss of consortium. [Docket No. 45, p. 23]. Defendants claim that they are immune from Plaintiffs' state claims under the Indiana Tort Claims Act ("ITCA"), Ind. Code § 34–13–3–3. The Court agrees. Accordingly, summary judgment is appropriate on Plaintiffs' state claims as well.

■ First and foremost, Plaintiffs' claims for excessive force, false arrest, and false imprisonment fail for the same reasons discussed above. Mills and Conley possessed probable cause to seize Flynn and reasonably used deadly force to do so. Thus, Defendants are entitled to summary judgment on Plaintiffs' unreasonable seizure and excessive force claims. *See Miller v. City of Anderson,* 777 N.E.2d 1100, 1104–05 (Ind.Ct.App.2002) (finding that if probable cause for arrest exists, claim for false imprisonment must also fail); *O'Bannon v. City of Anderson,* 733 N.E.2d 1, 3 (Ind.Ct.App.2000) (noting that excessive force claims under Indiana law are governed by Fourth Amendment reasonableness standard); *Garrett v. City of Bloom-*

*ington,* 478 N.E.2d 89, 93–94 (Ind.Ct.App. 1985) (Indiana law parallels federal law in false arrest cases; plaintiff has burden of proof to show absence of probable cause).

■ Plaintiffs' remaining negligence-based claims fall squarely with the immunity granted by the ITCA. In relevant part, the ITCA provides:

A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following:

.   .   .   .   .

(8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

Ind.Code § 34–13–3–3. "[T]he pivotal issues with regard to immunity for negligence claims against police officers and their employers under the ITCA are whether the officers were acting within the scope of their employment and whether the plaintiff's loss occurred as a result of law enforcement activities." *Miller,* 777 N.E.2d at 1103–04. It is undisputed that Mills and Conley were acting within the scope of their employment when they shot Flynn and that Flynn's loss resulted from law enforcement activities. As noted in *Miller:*

11. Defendants Marion County Sheriff's Department ("MCSD") and City of Indianapolis ("City") are also entitled to summary judgment on Plaintiffs' federal claims. To establish liability under § 1983 against the City and MCSD, Plaintiffs must go beyond proof that the City employed a tortfeasor as it is well settled that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a "municipality is only responsible for its employees' actions if taken

pursuant to an unconstitutional policy or custom of the municipality itself," *Garrison v. Burke,* 165 F.3d 565, 571 (7th Cir.1999), or when a "valid policy is unconstitutionally applied by a municipal employee" who has not been adequately trained and the "constitutional wrong has been caused by that failure to train." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiffs make no such claims. Accordingly, MCSD and the City are entitled to summary judgment on Plaintiffs' federal claims.

Miller's claim arises from the actions of Anderson police officers in arresting her pursuant to their belief that she was violating the law. Although this belief was later determined to be erroneous, the defendants have immunity from Miller's negligence claim under the ITCA because they were engaged in law enforcement duties. Thus, the defendants were entitled to summary judgment on Miller's negligence claim.

*Id.* at 1104. The same is true here. Defendants are entitled to summary judgment on Plaintiffs' negligence-based claims.[12]

### V. Conclusion.

Defendants' motion for summary judgment [Docket No. 38] is granted with respect to all claims. Plaintiffs' motion in opposition to Defendants' motion for summary judgment [Docket No. 44] is denied. Final judgment shall be entered accordingly. Each party shall bear its own costs.

SO ORDERED.

12. Although the briefs focus on the actions of Mills and Conley, the immunity provided by the ITCA extends to the City and MCSD as well. *Miller*, 777 N.E.2d at 1105 n. 1.