**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 07-1815**

_____

SEBASTIAN E. NJANG, Individually, as the next
best friend of and Personal Representative of
the Estate of Peter A. Njang; DOREEN NJANG,

Plaintiffs - Appellants,

versus

MONTGOMERY COUNTY, MARYLAND; CANDICE MARCHONE,
Officer,

Defendants - Appellees.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Alexander Williams, Jr., District Judge.
(8:05-cv-03068-AW)

_____

Argued:  April 11, 2008                Decided:  May 14, 2008

_____

Before WILKINSON, MOTZ, and DUNCAN, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Gregory L. Lattimer, Washington, D.C., for Appellants.
Edward Barry Lattner, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF
ROCKVILLE, Rockville, Maryland, for Appellees.  **ON BRIEF:** Leon
Rodriguez, County Attorney, Marc P. Hansen, Deputy County Attorney,
Paul F. Leonard, Jr., Associate County Attorney, COUNTY ATTORNEY'S
OFFICE FOR THE COUNTY OF MONTGOMERY, Rockville, Maryland, for
Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On August 12, 2004, Peter Njang ("Njang") was shot and killed by Montgomery County, Maryland ("County") police officer Candice Marchone ("Officer Marchone"), acting in the line of duty. Njang's brother Sebastian Njang and his wife Doreen Njang (together, "Appellants") filed this survival and wrongful death action against Officer Marchone and the County (together, "Appellees") pursuant to 42 U.S.C. § 1983. The district court below found Officer Marchone entitled to qualified immunity from the § 1983 action, and likewise granted summary judgment to Appellees on the other state and federal claims. For the reasons that follow, we affirm.

I.

We begin by setting forth the essential facts leading up to the shooting, as corroborated by eyewitnesses and substantially undisputed by Appellants. Njang and his wife emigrated to the United States from Cameroon in the spring of 2004 on so-called "diversity visas."[1] Njang's transition to the United States was made easier both by Njang's fluency in English[2] and the fact that

---

[1]A limited number of such permanent visas are awarded by lottery each year to applicants from countries that do not otherwise send a large number of immigrants to the United States. See 8 U.S.C. § 1153(c).

[2]Njang's brother Sebastian confirmed that Njang had studied English "[t]hroughout his educational career," communicated with Sebastian in English at home, and was not known to ever have had any problems understanding English. J.A. 121A-B.

a number of Njang's relatives had already relocated to the United States on diversity visas. Upon arrival in the United States, Njang and his wife moved into an apartment with Njang's brother Sebastian on Metzerrot Road in Maryland, just outside the District of Columbia.

On the morning of Thursday, August 12, 2004, Njang caught a bus from his residence to his aunt's apartment, a few miles away in the White Oak area of Montgomery County, Maryland. Njang and his aunt had plans to meet and go job-hunting. When Njang arrived after their prearranged meeting time, his aunt had already left without him. Njang posted himself outside of the window of his aunt's ground floor apartment, knocking on the window and peering in from time to time.[3]

Officer Marchone, a seven-year veteran of the County police force, was on regular patrol in her police cruiser that morning in the White Oak area. Just before noon, while she was eating her lunch and driving, she pulled into the apartment complex where Njang's aunt lived. She noticed Njang standing near a first-floor apartment window, but did not recognize him despite her frequent patrols in the neighborhood. As the cruiser approached Njang, he

---

[3]Appellants' brief offers descriptions of Njang's activities that morning as he ostensibly waited for his aunt to return. See, e.g., Appellants' Br. at 3 (describing Njang as "read[ing] his pocket bible" outside the window, "with not so much as a terse word or an awkward glance"). We are unable to determine the evidentiary basis for these assertions, and Appellants have offered none. We therefore cannot consider these assertions as valid.

walked away from the window, but did not return Officer Marchone's gaze. As Officer Marchone drove past, she noticed in her rear-view mirror that Njang continued to move away from the window, looking in the rough direction of her cruiser as it departed.

By virtue of her own familiarity with the area and specific conversations she had had with the property manager of the apartment complex, Officer Marchone was aware that there had been a series of daytime burglaries of first-floor apartments in the complex that summer. The perpetrators had, in some instances, gained entry into the first-floor apartments through first-floor windows. In light of this knowledge, Officer Marchone decided to pull into a parking space to further observe Njang's behavior. Realizing that a truck obstructed her view of Njang and the window, Officer Marchone pulled out and drove back towards Njang. She observed that he had resumed his post near the same window. As she pulled up parallel to the curb, Njang again took a few steps away from the window.

Officer Marchone opened her car door, asking Njang "something along the lines of . . . '[W]hat are you doing here? Come over here.'" J.A. 51. Njang did not move. Officer Marchone exited her cruiser, in uniform, and began walking towards Njang. She asked him, "Do you live around here?" J.A. 127A. Njang responded, "[N]o." Id. She then asked him where he lived, and Njang

responded "Metzerott."[4]  J.A. 127B.  Officer Marchone asked Njang if he was carrying identification, to which he responded in the negative.  Officer Marchone observed that Njang was acting nervously.

Officer Marchone decided to initiate a pat-down, or frisk, of Njang to check for weapons.  In particular, she wanted to ensure that he had no "knifes [sic], handguns, [or] burglary tools." J.A. 127C.  She leaned towards him, reaching towards the waistband on his right side.  Njang responded by turning the right half of his body away from Officer Marchone, and began to move his right arm behind his back.  Officer Marchone then grabbed Njang's right wrist, but he broke free, reaching his hand behind his back and under his untucked shirttails.  Fearing that Njang was reaching for a weapon, Officer Marchone pulled out her service handgun, aimed it at Njang, and simultaneously took a few steps back.

Officer Marchone demanded, "[L]et me see your hands."  J.A. 128C.  Njang responded by "pull[ing] out his right hand from his waist, behind him area, and had what appeared to be a weapon in his right hand."  J.A. 57.  Officer Marchone later explained that the weapon "looked to be a sharp metal object with a sharp tip on it, and it had what looked to be like a green handle."  Id.  That is,

---

[4]Officer Marchone was initially uncertain whether Njang responded "Metzerott" or "Merrimac."  J.A. 127B.  Both roads, however, were familiar to Officer Marchone and were only a few miles from Njang's aunt's apartment complex.

it "looked like a knife" to her.  Id.  It was later confirmed that the object was a green-handled box cutter with a silver-colored blade-holder extended, though the actual blades remained inside the box cutter and were not extended.

Officer Marchone "felt there was an immediate threat" and told Njang to "drop the weapon" and "[g]et down on the ground."  Id. She repeated those orders several times.  Njang did not comply, and instead began walking towards her with the box cutter extended in front of him.  She began backing up, keeping her handgun trained on Njang.  Njang raised his hands in the air as he advanced, saying "what, what" repeatedly.  J.A. 59.

As Officer Marchone continued to back up, she radioed for help, but could not break through among other police communications.  She finally did "break through and . . . said, I need help.  I'm at this location.  I have one at gunpoint." J.A. 60.  She became concerned that, if she had to shoot Njang, and missed, the bullet might pass through an apartment window or strike a bystander.  She thus angled her retreat so that the backdrop behind Njang would be a forest.  Retreating at this angle led her back in the direction of her cruiser.

Officer Marchone repeated her commands more forcefully, telling Njang "to drop it, to get down on the ground on his stomach or [she was] going to shoot." J.A. 61.  She warned a bystander and child to "get down." J.A. 60.  As she continued to implore Njang

7

to drop the weapon, Njang "continued to wave [the box cutter] in the air." J.A. 61.

Officer Marchone had, by this time, backed up nearly to her cruiser. Unable to retreat further, she decided to reach for her pepper spray. Njang kept advancing, getting so close that "[a]ll he had to do was lean forward [to] . . . get a hold of [her] gun," which prompted her to return both hands to her service handgun. J.A. 61-62. She then issued him "one more order to put it down, drop it, get down on the ground," saying, "I'm going to shoot." J.A. 62. Njang was two feet from Officer Marchone by this time, but still refused her orders. She fired one shot at Njang, hitting him in the chest.

Njang stumbled one step forward and fell to the ground. Officer Marchone kicked the box cutter out of his hand, donned protective gloves, and began administering first aid. With the help of a bystander, she radioed in a report of the shooting. Other officers arrived, and relieved her of her life-saving efforts. Njang died shortly thereafter at a nearby hospital.

Two eyewitnesses, contractors taking a lunch break in their truck parked some twenty feet from these events, observed the entire interaction. With their windows down for most of Officer Marchone's conversation with Njang, they were able to hear her repeated warnings, and see his refusal to comply. Their accounts corroborate the key details of the encounter provided by Officer

Marchone.  An internal County investigation quickly exonerated Officer Marchone of any wrongdoing.

Appellants sued Officer Marchone and the County, raising primarily a claim of wrongful death and survivorship under 42 U.S.C. § 1983 on the grounds that Officer Marchone employed excessive force in shooting Njang, in violation of the Fourth Amendment.  Appellants also filed a number of pendent state law claims, alleging violations of the Maryland state constitution and state tort law.  The district court granted qualified immunity and summary judgment to Officer Marchone on the § 1983 claim and summary judgment to the Appellees on the other claims.  Appellants timely appealed.

## II.

The primary issue before us on appeal is whether Officer Marchone is entitled to qualified immunity from suit on Appellants' claim that she utilized excessive force in shooting Njang, in violation of the Fourth Amendment.[5]  We review de novo the district court's grant of qualified immunity to Officer Marchone.  <u>See</u> <u>Johnson v. Caudill</u>, 475 F.3d 645, 650 (4th Cir. 2007).

---

[5]Although Appellants additionally contend that the initial stop-and-frisk also violated the Fourth Amendment, the overarching thrust of the relief they seek is recognition of, and compensation for, the allegedly unauthorized shooting of Njang.  We therefore focus our analysis on the excessive force claim.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  This qualified immunity from suit is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Analysis of whether Officer Marchone is entitled to qualified immunity proceeds in two ordered steps.  First, we must decide "whether a constitutional right would have been violated on the facts alleged."  Saucier v. Katz, 533 U.S. 194, 200 (2001).  Second, assuming we find a violation, we must decide "whether the right [violated] was clearly established" at the time of the challenged action.  Id.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend IV.  "[T]here can be no question that apprehension by the use of deadly force is a seizure" for purposes of the Fourth Amendment.  Tennessee v. Garner, 471 U.S. 1, 7 (1985).  The inquiry in an excessive-force case is therefore whether an officer's use of deadly force was reasonable under the Fourth Amendment.  See Vathekan v. Prince George's County, Md., 154 F.3d 173, 178-79 (4th Cir. 1998).

10

A police officer's use of deadly force against a suspect is reasonable where the "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." See Garner, 471 U.S. at 3;[6] see also Milstead v. Kibler, 243 F.3d 157, 162 (4th Cir. 2001). Because officers must make "split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving," Graham v. Connor, 490 U.S. 386, 396 (1989), a reviewing court evaluates the reasonableness of the officer's conduct "from the perspective of the officer on the scene, not through the more leisurely lens of hindsight." Abney v. Coe, 493 F.3d 412, 416 (4th Cir. 2007). Thus, we consider only "the information possessed by the officer at the moment that force is employed." Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005).

With those principles in mind, we begin our analysis by recounting what Officer Marchone knew in the moments leading up to the shooting. Officer Marchone was aware that there had been a series of recent first-floor burglaries in the complex in which the perpetrators sometimes gained entry through ground-level windows like the one where Njang had taken post that morning. After asking a few preliminary questions of Njang, Officer Marchone initiated a

---

[6]In Garner, the Court added that the employ of deadly force against a fleeing suspect is only reasonable if, in addition, such force "is necessary to prevent the escape" of the suspect. 471 U.S. at 3. Here, because Njang never attempted to flee, this requirement is inapposite.

11

pat-down search, checking for weapons. Njang pulled away and brandished a box cutter as Officer Marchone retrieved her service handgun. Despite Officer Marchone's commands to drop the weapon, Njang advanced upon her with the box cutter held in front of him. Backed up against her police cruiser, with Njang only two feet away, Officer Marchone warned him that she would shoot, and finally did shoot.

It seems eminently reasonable that Officer Marchone believed that Njang, advancing upon her with a box cutter despite her commands to drop it, "pose[d] a significant threat of death or serious physical injury" to her. See Garner, 471 U.S. at 3. Nevertheless, Appellants raise three principal arguments that Officer Marchone behaved unreasonably.

First, Appellants point out that the box cutter did not, in fact, have its blade extended at the time of the shooting. They argue that the box cutter was therefore not actually dangerous, and posed no threat to Officer Marchone. Appellants misunderstand our inquiry here. The proper test is whether a reasonable officer in Officer Marchone's position would have perceived Njang's actions to be threatening. See id. For example, this court has held that an officer may use deadly force in certain circumstances even when the officer has not confirmed that the suspect is armed. See McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) ("[W]e do not think it wise to require a police officer, in all instances, to actually

12

detect the presence of an object in a suspect's hands before firing on him.").

Here, Officer Marchone testified that the object in Njang's hands "looked like a knife" to her. J.A. 57. One eyewitness thought that the object was a box cutter, and another confirmed that it "looked like a knife to [him]." J.A. 99.[7] Considering the "tense, uncertain, and rapidly evolving" circumstances preceding the shooting, Graham, 490 U.S. at 396, we can hardly say that Officer Marchone was unreasonable in believing that the box cutter, blade extended or not, posed a serious threat.

Next, Appellants suggest that Njang did not intend to threaten Officer Marchone by holding the box cutter before him, but instead was trying to hand it over to her in response to her attempted pat-down search. This characterization of the incident strains credulity. Njang pulled his wrist away from Officer Marchone's grasp, moved it behind his back and extracted the box cutter. He advanced upon her, waving his arms and the box cutter before him, despite her commands for him to drop it. He continued to brandish the box cutter even when she warned him she was about to shoot. We simply cannot accept that it would appear to a reasonable officer that a man fluent in English would persist in his attempts to

_____

[7]The record before us includes photographs of the box cutter sans blade. J.A. 71-76. It is worth noting that the shiny metal blade-holder that extends from the handle could, in our view, easily be mistaken for a sharp implement.

13

peacefully hand over his weapon in the face of commands from a uniformed officer to drop it. Instead, we have only the testimony of Officer Marchone and the two eyewitnesses, who all viewed Njang's actions as intended aggression, not as attempted capitulation. See, e.g., J.A. 88 (testimony by eyewitness that Njang was "[t]hreatening [Officer Marchone] . . . by walking towards her with . . . the [box cutter]").

Finally, Appellants argue that Officer Marchone might have been motivated to deploy more force than necessary because Njang had questioned her authority as a female police officer. There is nothing in the record to support this conjecture,[8] save a statement made by Officer Marchone several days after the incident to an officer wrapping up an internal investigation, appearing in his notes as: "thought [suspect] not respecting her authority because woman." J.A. 147. The context for this notation is far from

---

[8]To the contrary, there is ample evidence that Officer Marchone attempted to avoid the use of deadly force. First, she attempted to back away from Njang instead of confronting him immediately after he drew his box cutter. This decision to retreat from the initial close confrontation does not, as Appellants contend, suggest that Njang posed no serious threat, but rather evidences Officer Marchone's prudent decision to buy time in the hope that the confrontation would end without incident. Indeed, Officer Marchone sought to minimize the risk of serious injury throughout the confrontation. For example, her retreat path backed her into her police cruiser only because she was taking care to ensure that no bystanders would be injured in the event she discharged her weapon. She also attempted to use her pepper spray instead of her handgun, but Njang's proximity rendered it unsafe to take her attentions away from the gun. Finally, she engaged in life-saving efforts after the shooting, though they ultimately proved unsuccessful.

14

clear; it could very well represent Officer Marchone's post hoc speculation as to why Njang had persisted in advancing upon her despite the increasing certainty that he would be shot. In any event, Officer Marchone's subjective motivations are legally irrelevant. As this court has made clear, "[w]e do not inquire into an officer's motives, intentions, or tendencies, and instead determine whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002) (internal quotations omitted). As we have already stated, we find that a reasonable officer would indeed have concluded that the threat posed by Njang justified the shooting.

Because Officer Marchone reasonably believed that Njang posed a threat of serious injury to her, we conclude that she did not employ excessive force in shooting Njang.[9] We therefore agree with the district court that Officer Marchone is entitled to qualified immunity from Appellants' claim of excessive force, and that summary judgment was appropriate.[10]

---

[9]Because we find that Officer Marchone violated no constitutional right of Njang, we do not reach the second step in the qualified-immunity analysis, whether the right was clearly established.

[10]Appellants also seek to hold the County liable under § 1983 for alleged negligent training and supervision of Officer Marchone, pursuant to Monell v. Dept. of Social Services, 436 U.S. 658 (1978). However, a government is "necessarily . . . not liable for any alleged injuries" where "no constitutional violation occurred." S.P. v. City of Takoma Park, 134 F.3d 260, 274 (4th Cir. 1998); see

15

Appellants also challenge the district court's grant of summary judgment to Appellees on Appellants' claims under the Maryland constitution and under Maryland state tort law. We review de novo an award of summary judgment. <u>Odom v. S.C. Dep't of Corrections</u>, 349 F.3d 765, 769 (4th Cir. 2003). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We consider each of Appellants' challenges in turn.

A.

Appellants allege that Appellees violated Njang's rights under Article 26 of the Maryland Constitution.[11] Maryland courts "have

---

also <u>Belcher v. Oliver</u>, 898 F.2d 32, 36 (4th Cir. 1990) (finding that a § 1983 claim against officers' superiors "is unavailing where there has been no underlying constitutional infraction"). Furthermore, Appellants have offered no evidence of improper training or supervision. We therefore find the district court's grant of summary judgment on this claim to be proper.

[11]Article 26 provides:

That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Md. Const. art. XXVI.

long recognized that Article 26 is <u>in pari materia</u> with the Fourth Amendment and that decisions of the Supreme Court interpreting the Federal right are entitled to great respect in construing the State counterpart." <u>Richardson v. McGriff</u>, 762 A.2d 48, 56 (Md. 2000). The <u>Richardson</u> court expressly adopted, as the proper way to analyze claims of excessive force under Article 26, the "reasonable officer" test outlined in <u>Garner</u> and <u>Graham</u> and applied above to Appellants' § 1983 claims. <u>See</u> <u>id.</u> The Article 26 claim, therefore, must fail for the same reasons that the § 1983 claims fail.[12] <u>See</u> <u>supra</u> Part II.

B.

Appellants also challenge the district court's award of summary judgment on a number of Maryland state-law tort claims, specifically, claims against Officer Marchone for assault and battery and for the negligent use of force, and derivative claims against the County under the doctrine of respondeat superior.

With respect to the tort claims against Officer Marchone, the district court found that: (1) though she had intentionally injured Njang, the action was legally justified and therefore no action for

---

[12]Appellants also allege that Appellees violated Article 24 of the Maryland Constitution. Article 24 provides "[t]hat no man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. art. XXIV. A claim under Article 24 is analyzed under Maryland state law "in the same manner as if the claim were brought under Article 26." <u>Randall v. Peaco</u>, 927 A.2d 83, 89 (Md. Ct. Spec. App. 2007). Thus, just as Appellants' Article 26 claim fails, so too must their Article 24 claim.

17

assault and battery could survive summary judgment; and (2) she was entitled to public official immunity from the negligence claim.  We agree with both conclusions.  As the highest court in Maryland has explained, "th[e] jurisprudence [governing Fourth Amendment excessive force actions] also controls [a party's] actions for battery and gross negligence.  Self-defense is a defense to the common law tort of battery."  Richardson, 762 A.2d at 56.  Since we have held that Officer Marchone did not employ excessive force in shooting Njang, we likewise conclude that the shooting was justified and therefore cannot give rise to Maryland state law actions for assault and battery or for negligent use of force.[13]

---

[13]With respect to the negligence action, Officer Marchone cannot be held liable for the additional reason that she enjoys public official immunity under state law.  Maryland law recognizes that "[q]ualified public official immunity is a defense to negligence actions."  Williams v. Prince George's County, 685 A.2d 884, 896 (Md. Ct. Spec. App. 1996).  Under the public official immunity doctrine, "'an official of a municipal corporation while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.'"  Id. (quoting Md. Code Ann., Cts. & Jud. Proc. § 5-321(b)(1)).  Appellants argue that Officer Marchone does not enjoy public official immunity here because she acted with malice in shooting Njang for allegedly disrespecting her authority as a female police officer.  Under Maryland law, however, "[m]alice has been defined as the performance of an act without legal justification or excuse and with an evil or rancorous motive influenced by hate, the purpose of which is to deliberately and wilfully injure another."  Id. (emphasis added).  Again, since we have already held that Officer Marchone was justified in shooting Njang, she is entitled to public official immunity from Appellants negligence claim.

With respect to the tort claims against the County, the district court found the County to enjoy governmental immunity. "[L]ocal governments enjoy[] immunity from tort liability . . . with respect to non-constitutional torts based on activity classified as 'governmental.'" Rios v. Montgomery County, 872 A.2d 1, 13 (Md. 2005) (recognizing that such immunity still obtains notwithstanding the enactment of the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 5-304). There is no dispute here that the County was acting in a governmental capacity in employing, training, and supervising Officer Marchone. Therefore, the County enjoys governmental immunity from both tort claims, and summary judgment on the claims was appropriate.

IV.

We are not unsympathetic to the plight of the survivors of Peter Njang, whose dream of building a life in the United States was cut short by the unfortunate events of August 12, 2004. Nevertheless, the law simply provides no remedy when a police officer is driven to use deadly force in the face of a reasonably perceived serious threat. The decision of the district court is therefore

AFFIRMED.

19